BROWN v. UNITED STATES.

(Circuit Court of Appeals, Eighth Circuit. April 24, 1906.)

No. 2,310.

**1. POST OFFICE—USE OF MAIL—SCHEME TO DEFRAUD—DESCRIPTION IN INDICT-MENT.**

In a prosecution for depositing a letter in the post office in execution of a scheme to defraud in violation of Rev. St. § 5480 [U. S. Comp. St. 1901, p. 3696], defendant cannot be convicted unless the proof establishes the "scheme" substantially as alleged in the indictment.

[Ed. Note.—Nonmailable matter relating to frauds and counterfeiting, see note to Timmons v. United States, 30 C. C. A. 86.]

**2. SAME—ISSUES AND PROOF.**

Accused was indicted for depositing a letter in the post office in execu-tion of a scheme to defraud. The scheme alleged consisted of the inser-tion of an advertisement in a newspaper containing the words "How to speculate on Board of Trade. Sent free by J. L. Brown & Co.," etc., to induce the public through correspondence conducted by mail to purchase through defendant under the name of "J. L. Brown & Co." commodities on some board of trade to enable defendant who did not intend to make such purchases to convert the money to his own use. The proof was that one Hardwick saw such advertisement and without correspondence sent defendant $1,000 by wire, with instructions to buy options on pork. De-fendant immediately returned a memorandum showing a sale made by him to Hardwick, and not a purchase made on a board of trade for him. Thereafter Hardwick deposited more money, and directed further pur-

chases of pork, which were made in the same manner. *Held*, that such facts were insufficient to establish the charge laid in the indictment.

In Error to the District Court of the United States for the Western District of Missouri.

W. F. Riggs, for plaintiff in error.

A. S. Van Valkenburgh (Leslie J. Lyons, on the brief), for defendant in error.

Before SANBORN, HOOK, and ADAMS, Circuit Judges.

ADAMS, Circuit Judge. The plaintiff in error was indicted and convicted for depositing a letter in the Kansas City post office in execution of a scheme to defraud in violation of section 5480 of the Revised Statutes [U. S. Comp. St. 1901, p. 3696]. The scheme alleged in the indictment to have been devised by him is substantially this: that he would insert in a newspaper called the "Kansas City Packer," the following advertisement: "How to speculate on Board of Trade. Sent free by J. L. Brown & Co., Gibraltar Bldg., Kansas City, Mo. Grain, Stocks, and Provisions. Ref. Am. Nat'l. Bank," for the purpose of inducing the public through correspondence conducted by mail to purchase through him under the name of "J. L. Brown & Co." commodities on some board of trade, and for the purpose of enabling him so to do to send him money pretended by him to be necessary either in paying for the same or in making deposits of margins on futures bought by him for account of his customers on such boards, whereas it was not his intention to use such money for either of these purposes, but on the contrary, to convert the same to his own use. This is not a complicated scheme. It consists in the one alleged false pretension that defendant would make use of such money as might be intrusted with him in making purchases or sales of commodities, or futures in the same, on some board of trade for account of his customers. The purpose of requiring a description of the scheme to defraud in the indictment is to definitely and clearly inform the accused of the scheme charged against him so as to enable him to make his defense. Brooks v. United States (C. C. A.) 146 Fed. 223, decided at this term, and not yet officially reported; Stewart v. United States, 55 C. C. A. 641, 119 Fed. 89, 94; United States v. Hess, 124 U. S. 483, 486, 8 Sup. Ct. 571, 31 L. Ed. 516.

It follows that one must be convicted, if at all, on the scheme as alleged, and if the scheme as alleged is not substantially established by the proof he cannot be convicted. In the view we take of this case it is necessary to refer to the proof with some particularity. One Hardwick, a resident of Oklahoma, saw a copy of the Kansas City Packer, published January 4, 1904, containing the business card of J. L. Brown & Co., in the language already set out. Without any preliminary correspondence or other communication between him and Brown & Co., he transmitted by wire to the latter company, on February 7, 1902, $1,000, as he says in his evidence, "to buy options on July pork." Brown & Co. received the money, and on the same day (February 7th), acknowledged its receipt and disposition in a letter written and sent to Hardwick in the following words:

"We have your telegram to buy 1,000 barrels Chgo. July Pork and on receipt of telegram from Bank, we executed your order for same as per inclosed contract. We thank you very much, etc."

The contract inclosed, so far as necessary for our present purpose, is in the following words:

"J. L. Brown & Co. Grain, Provisions and Stocks. Gibraltar Building. Kansas City, Mo., 2/7/02. E. F. Hardwick: You have this day bought from us at regular commission less than the prices named in the memo. One thousand (1,000) barrels of Chicago pork at $16.05 per bbl. for delivery in July. Margins deposited with us $1,000. Notice. All contracts made with us for the purchase or sale of grain, provisions or stocks made with us or through us are subject to the rules and regulations of the board of trade or stock exchange in the city where delivery is to be made. * * * "

There was also an inclosure in this letter of a pamphlet entitled "How to speculate." In this, among other things unnecessary for our present purposes, the following clearly appears:

"In buying and selling grain and provisions upon a margin, our customers can take advantage of the different fluctuations of the market by buying or selling on every decline or advance."

Towards the latter part of February, Brown & Co. wired Hardwick, calling for more margins, whereupon, without complaint, $500 were sent by telegraph to Brown & Co. On March 3d, Hardwick testifies that thinking "that pork would be a pretty good proposition," he sent Brown & Co. $500 more, with directions "to buy 500 barrels more of pork." This telegram was answered by a letter, written and mailed by Brown & Co., March 4, 1902, in part as follows:

"Mr. E. F. Hardwick, Alva, Okl.—Dear Sir: On receipt of telegram from Exchange National Bank of your city, we executed an order for 500 barrels of Chicago July Pork at 15.52, as per contract inclosed. We thank you very much for the order, etc."

The contract inclosed bears the same date, March 4th, and reads as follows:

"E. H. Hardwick, You have this day bought from us at the regular commission less than the prices named in this memo. 500 Barrels Chicago Pork at $15.52 per barrel for delivery in July."

The balance of the contract is the same as that bearing date February 7th, already partially copied.

The record discloses nothing more with reference to either of these deals until April 28th, when Hardwick came to Kansas City personally, met defendant Brown, and informed him that he had come to close the pork deals. Brown proceeded to act and informed him that he had closed it out at $17.12. Hardwick insisted upon an immediate settlement, and told Brown that he had been over to the board of trade and had ascertained that a settlement was due immediately upon closing out the deal. The money was not paid as requested and the evidence discloses an effort on Brown's part to evade settlement with Hardwick and to conceal his bank credits, doubtless for the purpose of embarrassing Hardwick in any attempt to enforce payment. As a result much ill feeling seems to have been engendered between Hardwick and Brown. The evidence further discloses that it was cus-

tomary among the brokers in Kansas City at the time in question, upon receiving orders like those sent by Hardwick to Brown & Co., to either make the transaction themselves and obligate themselves to make the delivery required by the terms of the order, or go into open market and as agent for the customer, there make the transaction. In other words, that the custom was for brokers, upon receiving orders to buy or sell commodities for patrons, to act either as principal or broker in the transaction. There was not only no evidence of any other transactions in which customers of Brown & Co. made losses, but positive evidence that the Hardwick case was the only one of that kind. The government made no effort to show any other transactions with Brown & Co. which it claimed to be fraudulent. The defendant, on the other hand, undertook to make a showing of the course of his business for the last five years, but the government's objection to that showing prevented it. There is not only no evidence that Hardwick was dissatisfied with the terms of the sales to him by Brown & Co., as stated in the contracts accompanying the two letters of February 7th and March 3d; but there is affirmative evidence that Hardwick never communicated any dissatisfaction therewith to the defendant.

We fail to find in the proof so made any demonstration of the scheme to defraud as laid in the indictment. That scheme is that Brown would hold himself out and pretend to act as an agent for others in buying and selling commodities on the floor of the public exchanges. The card of J. L. Brown & Co., published in the Kansas City packer, is claimed by the government to be evidence of a fraudulent design. In fact, it is pleaded in the indictment as the initiation of the scheme to defraud. We fail to discover in the card any more evidence of a pretension on defendant's part to operate as a broker on the public exchanges than to conduct a bucket shop of his own. One man only, so far as the record shows, saw and acted upon it. That was Mr. Hardwick of Oklahoma. But he did not understand or treat it as a representation or assurance that Brown & Co., would act as his agents in buying commodities on Chicago or any other board of trade. On the contrary he treated it as the advertisement of a bucket shop, dealing in options. He knew from the general custom prevailing among Kansas City brokers, or in some other way, that Brown & Co., might make a bookkeeping transaction with him charging him with the market price of the pork on the date of the transaction, and later, on the date of the contemplated delivery, crediting him with the then market price and settling on the basis of differences so shown. This appears from what immediately followed forming a part of the transactions in question. Brown & Co., on receiving Hardwick's remittances acknowledged their receipt and informed him that they had executed his orders as "per contract inclosed." The contracts so inclosed informed Hardwick in plain and unambiguous terms that Brown & Co. had not negotiated a purchase for him on any board of trade, but had themselves sold him the pork desired. Hardwick received the letters and contracts relating to both deals in due course of mail, and by his repetition of an order, after being informed how Brown & Co. treated the first one and by his con-

tinued silence, must be presumed to have acquiesced in the firm's action. He consented to have the firm take the deals and seems never to have contemplated a trade on any public exchange.

From these prominent and undisputed facts taken in connection with the want of proof of any irregular or fraudulent practices by defendant with any other persons or in any other ways, we confidently reach the conclusion that the scheme to defraud as laid in the indictment was not proved. Up to April 28th Hardwick and Brown & Co. appear to have conducted their business harmoniously and satisfactorily. Hardwick seems to have been the initiator of each deal; to have determined on his own responsibility that "pork would be a pretty good proposition," and to have voluntarily sent money to defendant's firm for the purpose of buying July options in it. All of a sudden, with no preliminary correspondence or explanation, Hardwick, on that day, appeared in Kansas City, made himself known to defendant, and without making any complaint concerning the firm's treatment of his deals demanded an immediate closing and settlement of them. No apology is intended to or can be made for Brown's conduct from this time on. He began systematically and stealthily to conceal his money, put every possible obstacle in the way of Hardwick's securing payment of the balance due him, and personal feeling became bitter between them. The criminal court of the state was first resorted to by Hardwick and later this proceeding was instituted.

Section 5480 serves a wise and useful purpose, primarily and chiefly to prevent the mail service of the United States being used for fraudulent purposes, but incidentally, and in a subordinate way, to prevent the formation and execution of fraudulent schemes under the guise of plausible business methods. To permit any persons to resort to its salutary provisions for any ulterior purpose would tend to impair its legitimate usefulness.

The judgment must be reversed, and the cause remanded for a new trial.