GOULD et al. v. UNITED STATES.

(Circuit Court of Appeals, Eighth Circuit.   December 3, 1913.)

Nos. 3924, 3925, 3926, 3970, 3971, 3972.

1. POST OFFICE (§ 48*)—MISUSE OF MAILS—SCHEME TO DEFRAUD—INDICTMENT.
    Since, in a prosecution for misuse of the mails in furtherance of a
    scheme to defraud, the use of the post office in the execution of the scheme,
    and not the scheme itself, is the gist of the offense, an indictment, de-
    scribing the acts alleged to have been done by accused in the execution
    of the scheme, was not fatally defective because it did not allege the
    scheme with sufficient particularity.
       [Ed. Note.—For other cases, see Post Office, Cent. Dig. §§ 67–80;  Dec.
    Dig. § 48.*]

2. POST OFFICE (§ 48*)—MISUSE OF MAILS—SCHEME TO DEFRAUD—INDICTMENT—
    PERSONS TO BE DEFRAUDED.
       Where an indictment for misuse of the mails in furtherance of a scheme
    to defraud charged that defendants promoted a land and irrigation com-
    pany to irrigate certain arid land without a reasonable expectation of
    being able to complete the system, etc., and that they devised a scheme
    to defraud all such persons who could or might be induced by means of
    defendants' fraudulent and false devices, etc., to become purchasers of
    contracts for·water rights or for water from the irrigation company, etc.,
    it sufficiently alleged that the public generally was to be defrauded, and
    was not objectionable for failure to state the names of the persons it
    was intended to defraud.
       [Ed. Note.—For other cases, see Post Office, Cent. Dig. §§ 67–80;  Dec.
    Dig. § 48.*
       Nonmailable matter, see notes to Timmons v. United States, 30 C. C.
    A. 79;  McCarthy v. United States, 110 C. C. A. 548.]

3. POST OFFICE (§ 49*)—MISUSE OF MAILS—SCHEME TO DEFRAUD—MAILING
    LETTERS.
       Where, in a prosecution for misuse of the mails in furtherance of a
    scheme to defraud, it appeared that certain letters were mailed by defend-
    ants in connection with the scheme, and for the purpose of carrying it
    out, such proof sufficiently showed that the letters were mailed in execu-
    tion of the scheme.
       [Ed. Note.—For other cases, see Post Office, Cent. Dig. §§ 84–86;  Dec.
    Dig. § 49.*]

4. POST OFFICE (§ 48*)—MISUSE OF MAILS—SCHEME TO DEFRAUD—INDICTMENT.
       Where an indictment for misuse of the mails in furtherance of a scheme
    to defraud alleged that certain letters written by defendants were de-
    posited in the post office, addressed, etc., the indictment was not defective
    for failure to charge that the letters were addressed "to" the persons
    designated.
       [Ed. Note.—For other cases, see Post Office, Cent. Dig. §§ 67–80;  Dec.
    Dig. § 48.*]

5. CRIMINAL LAW (§ 901*)—TRIAL—DIRECTION OF VERDICT—WAIVER.
       Where defendants' counsel at the close of the evidence for the prosecu-
    tion moved for a directed verdict, but did not renew the same at the
    close of all the evidence, objection was waived, and they could not there-
    after claim that the evidence was insufficient to sustain a conviction.
       [Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 2124;  Dec.
    Dig. § 901.*]

6. POST OFFICE (§ 49*)—EVIDENCE—RELEVANCY—RECORDS.
       In a prosecution for misuse of the mails in furtherance of a scheme to
    defraud in the promotion of a land and irrigation company, a complaint,

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

in an action against the company by a third person to recover for maps and literature, in which the false representations were alleged to have been made to the public, together with a default judgment, execution, and return thereon, but containing no recital in the judgment that there had been any service of process on the defendant, and in the absence of proof that the court rendering the judgment had any jurisdiction, was inadmissible as bearing on defendants' solvency or ability to carry out the representations made.

[Ed. Note.—For other cases, see Post Office, Cent. Dig. §§ 84–86; Dec. Dig. § 49.*]

7. CRIMINAL LAW (§ 448*)—EVIDENCE—MATERIALITY.

On an issue as to the financial responsibility of accused, an answer of a witness that she was led to believe at first that accused had a great deal of money, but later in witness' employment she came to the conclusion that he had nothing, was objectionable as a mere opinion or conclusion of the witness, without facts on which to base it.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 1035–1039, 1041–1043, 1045, 1048–1051; Dec. Dig. § 448.*]

8. CRIMINAL LAW (§ 364*)—EVIDENCE—RES GESTÆ.

In a prosecution for misuse of the mails in furtherance of a scheme to defraud, a letter written by one defendant to another, at a time when it was claimed that the writer was engaged in executing the fraudulent scheme, and tending to show good faith in attempting to bring the project in question to a successful conclusion, when it did not appear that he was informed that any prosecution was contemplated, was admissible as res gestæ.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 805, 808–810, 813, 816–818; Dec. Dig. § 364.*]

In Error to the District Court of the United States for the District of Colorado; Robert E. Lewis, Judge.

John Gould and others were convicted of misuse of the mails in furtherance of a scheme to defraud, and they bring error. Reversed and new trial granted.

Henry McAllister, Jr., of Denver, Colo. (Joel F. Vaile and William N. Vaile, both of Denver, Colo., on the brief), for plaintiffs in error.

Fred A. Maynard, Sp. Asst. Atty. Gen. (Harry Eugene Kelly, U. S. Atty., of Denver, Colo., on the brief), for defendant in error.

Before HOOK and CARLAND, Circuit Judges, and VAN VALKENBURGH, District Judge.

CARLAND, Circuit Judge. Gould, Wright and White were convicted and sentenced for a violation of section 215 of the Criminal Code (Act March 4, 1909, c. 321, 35 Stat. 1130 [U. S. Comp. St. Supp. 1911, p. 1653]), which so far as is material to the present case reads as follows:

"Sec. 215. Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, * * * shall, for the purpose of executing such scheme or artifice or attempting so to do, place, or cause to be placed, any letter, * * * whether addressed to any person residing within or outside the United States, in any post office, * * * to be sent or delivered by the post-office establishment of the United States, * * * shall be fined not more than one thousand dollars, or imprisoned not more than five years, or both."

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

The validity of the indictment was challenged in the the trial court by demurrer and motion in arrest. The indictment, so far as it relates to a fraudulent scheme, is copied in the margin.[1]

The indictment then proceeded to allege the representations and promises to be false and fraudulent to the knowledge of defendants. It was then further alleged that the defendants, for the purpose of executing said fraudulent scheme, caused to be placed in the United States post office at Denver, Colo., two certain letters, set out in the indictment, to be sent and delivered by the post office establishment of the United States. Four other defendants were jointly indicted with plaintiffs in error, namely, Woody, Gibson, Baker, and Rose. Woody was not tried. Gibson, Baker, and Rose were acquitted.

[1] It is claimed that the indictment does not set forth with sufficient particularity the scheme which it is alleged defendants had devised. United States v. Hess, 124 U. S. 483, 8 Sup. Ct. 571, 31 L. Ed. 516; U. S. v. Stokes, 157 U. S. 187, 15 Sup. Ct. 617, 39 L. Ed. 667;

[1] "That John Gould, Corydon A. Woody, J. Albert Wright, Frank White, Homer A. Gibson, Sam N. Baker, and Robert W. Rose * * * had devised a scheme to defraud all such persons who could or might be induced, by means of any of the fraudulent and false devices, representations, pretenses, and promises hereinafter mentioned, to become purchasers of contracts for water rights and for water from the Riverside Land & Irrigation Company, a corporation organized and existing under the laws of the state of Colorado, and for the purpose of obtaining from said purchasers of such water rights and water, by means of the false and fraudulent representations, pretenses, and promises aforesaid, money and other property, which said fraudulent scheme was then and there substantially as follows, to wit:

"That the said defendants falsely represented and pretended that a certain corporation known as the Riverside Land & Irrigation Company, at all the times since its incorporation, managed, operated, and controlled by the said defendants, was the owner of and controlled a certain reservoir and ditch system situated in the counties of Mesa, Delta, and Gunnison in the state of Colorado, called the 'Riverside Project,' the 'Excelsior Ditch and Reservoir System,' the 'Riverside Canal,' and by various other names and words, all and singular used to designate a pretended irrigation project and system advertised, promoted, operated, and controlled by said defendants, all, each, and every of said names referring to and meaning the said irrigation system claimed by said corporation, the Riverside Land & Irrigation Company; that said defendants falsely represented, pretended, and promised that said corporation, the Riverside Land & Irrigation Company, had constructed, had in process of construction, and would in the near future construct, a system of large reservoirs for water storage purposes, and ditches for distributing, carrying, and delivering water to certain lands situated in the counties of Mesa and Delta aforesaid, and represented by the said defendants as susceptible of irrigation by means of said pretended irrigation system; that said corporation had valuable water and water rights for said ditches and reservoirs, and that said corporation was the owner of said ditch and reservoir system, and was the owner of and entitled to sufficient water to irrigate, by and through said pretended irrigation system, 100,000, or more, acres of the said lands hereinbefore and hereinafter mentioned, and that said company could and would sell water and water rights to persons who desired to purchase the same for the irrigation of the lands under said ditches, at fixed prices, which prices were set forth in contracts for water rights issued by the said the Riverside Land & Irrigation Company, and otherwise made known by said defendants as hereinafter set forth; that said water right contracts so offered for sale were falsely represented to be valuable water right contracts because of the alleged ownership by said corporation, the Riverside Land & Irrigation Company,

Dalton v. United States, 127 Fed. 544, 62 C. C. A. 238; Etheredge v. United States, 186 Fed. 434, 108 C. C. A. 356; Stewart v. United States, 119 Fed. 89, 55 C. C. A. 641; Miller v. United States, 133 Fed. 337, 66 C. C. A. 399. It is first claimed that in the general allegation at the commencement of the charging part of the indictment no scheme is set forth, for the reason that certain "false devices, representations, pretenses, and promises *hereinafter* mentioned" are referred to, and then in the same clause is found the following language: "By means of the false and fraudulent representations, pretenses, and promises *aforesaid*." We are clearly of the opinion, however, that if the use of the words "hereinafter" and "aforesaid" may be said to have been pleaded, with the result that nothing is alleged, there still remains the allegation that the defendants had devised a scheme to defraud, "which said scheme was then and there substantially as follows"; but when we get this far, we are met by the contention that the language which follows describes acts done in the execution of the scheme, but not the

of large quantities of water available for irrigating the lands hereinbefore and hereinafter mentioned: that said defendants falsely pretended and represented that, by virtue of said water right contracts to be entered into by and between the said prospective purchasers and the said the Riverside Land & Irrigation Company, and the payment of the sums of money in said water right contracts stipulated to be paid to said corporation, the purchasers thereof would be entitled to and receive of said corporation, and said corporation would procure and deliver to such purchasers waters sufficient to irrigate the lands described and referred to in such contracts, and that the said defendants falsely represented that there were large tracts of vacant public land of the United States subject to entry under the desert land laws of the United States, susceptible of irrigation and reclamation under and by means of said pretended reservoir and irrigation system, and that all entrymen of said public land who [purchased] water from said corporation, and who entered into water right contracts with said corporation would and could receive from said corporation water sufficient to irrigate and reclaim all lands for which water or water rights were purchased, and would thereby be enabled to reclaim land so entered and to secure patents for same from the United States of America; that to prospective purchasers of land, water, and water right contracts, and to prospective entrymen of said vacant public lands of the United States, the said defendants falsely represented and pretended that, upon the purchase of water and water right contracts from said defendants and said corporation, water would be furnished, commencing in the years 1910, 1911, and in the near future, for the irrigation and reclamation of the lands so purchased or entered; and defendants further falsely and fraudulently promised and engaged to and with persons entering upon said public lands of the United States under the desert land laws that, in consideration of the conveyance by such entrymen to said defendants, or to some corporation or person nominated and designated by said defendants, of a certain number of acres of the land so entered, the defendants would furnish water and water rights, free of all expense to such entrymen, for the irrigation and reclamation of the remainder of said lands so entered; that the defendants further falsely represented and promised that all money received and to be received from purchasers of water and water contracts would be by said defendants devoted and applied to the construction and completion of the aforesaid irrigation system; that the water claimed by said defendants for the irrigation of all such lands was falsely represented by said defendants to be owned by said defendants and said corporation; that it was further falsely represented by said defendants that the money necessary for the completion of said reservoir and ditch system had been raised, and that bonds for the construction of said system had been issued and negotiated for sale, and that the building

scheme itself which defendants had devised before they entered upon its execution. The rule which applies to indictments for conspiracy is invoked, namely, that a charge of conspiracy cannot be aided by the averment of acts done in pursuance thereof. United States v. Britton, 108 U. S. 205, 2 Sup. Ct. 531, 27 L. Ed. 698. We do not think from the standpoint of pleading a charge of conspiracy and using the post office establishment in the execution of a scheme to defraud are at all parallel. In the former the conspiracy is the whole offense. The acts done in pursuance thereof simply make the conspiracy punishable. While in the case at bar the use of the post office establishment in the execution of a scheme to defraud is the offense which the statute denounces, and while it is held that the scheme must be sufficiently set forth so as to acquaint the defendant with the particulars thereof, still the scheme need not be set forth with that particularity which would be required if the scheme was the gist of the offense. Brooks v. United States, 146 Fed. 223, 76 C. C. A. 581; Lemon v. United States, 164 Fed. 953, 90 C. C. A. 617; Brown v. United States, 143 Fed. 60, 74

and construction of said reservoir and ditch system was assured; and that the said defendants, as a part of said fraudulent scheme and device, and for the purpose aforesaid, did, in the name of the Riverside Land & Irrigation Company, the Riverside Colonization Company, J. B. Frisbee & Co., J. B. Frisbee, and divers others names, firms, and individuals to the grand jury now unknown, but all for the said defendants and for their use, gain, and benefit, by means of and through the United States mails and otherwise, circulate, distribute, and publish to the public generally, by placing and causing to be placed in public newspapers, by distributing, sending, and delivering, and causing to be distributed, sent, and delivered, circulars, advertisements, plats, and letters, all and each setting forth the false representations, pretensions, and promises hereinbefore set forth, for the purpose of inducing persons to purchase the water rights and water right contracts hereinbefore mentioned; and that the said false pretenses, promises, and representations were made by said defendants and their various agents to prospective purchasers for the purposes aforesaid.

"Whereas, in truth and in fact, neither the said defendants nor the said corporation, the Riverside Land & Irrigation Company, at any time, or now, own any reservoir or ditch system situated in the counties of Mesa, Delta, and Gunnison, or elsewhere; and whereas, in truth and in fact, neither the said defendants nor the said corporation, the Riverside Land & Irrigation Company, had constructed, nor was there in the process of construction by said defendants or by said corporation, the Riverside Land & Irrigation Company, nor will there be in the near future, or at all constructed by said defendants or said corporation, any system of large reservoirs or otherwise, for water storage purposes or ditches for the distribution, carriage, or delivery of water to any of said lands situated in the counties of Mesa and Delta as aforesaid, or elsewhere; and whereas, in truth and in fact, neither the said defendants nor the said corporation, the Riverside Land & Irrigation Company had, or now have, any valuable water rights, or any water rights at all, for the reservoir and ditch system, claimed by the said defendants to be owned by the corporation, nor were the said defendants or the said corporation, the Riverside Land & Irrigation Company, the owners, or owner, of any reservoir and ditch system, nor were the said defendants or the said corporation, the Riverside Land & Irrigation Company, the owners, or owner, of sufficient water, or any water at all, to irrigate or reclaim 100,000 acres of land, or any land whatsoever; nor were the said defendants, or the said corporation, the Riverside Land & Irrigation Company, the owners, or owner, of any water or any water rights whatsoever for the irrigation of any lands or for any other purposes whatsoever."

C. C. A. 214; Hyde v. United States (C. C. A.) 198 Fed. 610. The force of the contention made by counsel under this head is illustrated by the fact that if the indictment had alleged "that the defendants would falsely represent and pretend" instead of the words "that the defendants falsely represented and pretended" the point urged would have had no application. There is no doubt in our minds but that any person of common understanding would easily understand from the indictment the scheme which it is alleged the defendants had devised. We do not wish to be understood as indorsing this mode of pleading, but we do not think the pleading in this instance is sufficiently bad to warrant a reversal of the judgment.

[2] It is next urged that the names of the persons to be defrauded must be stated. Of course the defendants, when they devised the scheme to defraud set out in the indictment, if they did devise it for such purpose, did not know the names of the individuals who would be defrauded, and the grand jury in stating the scheme must state it as the defendants understood it. We think the indictment sufficiently charges what is equivalent to a charge that it was the public generally which was to be defrauded. Brown v. United States, 146 Fed. 219, 76 C. C. A. 577; Horn v. United States, 182 Fed. 721, 105 C. C. A. 163.

[3] It is next urged that the letters set out in the indictment show on their face that they were not mailed in the execution of the scheme set out in the indictment. We cannot agree to this. The letters show that they were mailed in connection with the scheme, and for the purpose of carrying the same out. Whether the scheme was fraudulent or not was a question for the jury. Durland v. United States, 161 U. S. 306, 16 Sup. Ct. 508, 40 L. Ed. 709; Lemon v. United States, 164 Fed. 953, 90 C. C. A. 617.

[4] It is further urged that the indictment is bad in not alleging that the letters set out therein were addressed *to* some person. The indictment alleges that the letters were deposited in the post office, addressed "Mr. U. S. Willey, Whitewater, Colo.," and "Mr. Q. A. Woodward, Brush, Colo." We are of the opinion that the criticism is too technical. Letters so addressed, in our judgment, were addressed to the respective addressees.

[5] It results from what has been said that the demurrer and motion in arrest were properly overruled. It is assigned as error that the evidence was not sufficient to justify the verdict. While this assignment is argued by counsel for both sides, there was no ruling of the trial court upon which such an assignment could be based. A motion was made by counsel for the defendants at the close of the evidence for the prosecution for a directed verdict, but it was not renewed at the close of all the evidence, and was therefore waived. Neither was there any exception to the charge of the court. There remain to be considered, however, the assignments of error relating to the admission and rejection of evidence.

[6] It is contended that the trial court erred in admitting in evidence United States Exhibit No. 7. This exhibit consisted of certified copies of a complaint, judgment, execution, and return thereon in the

case of George S. Clayson, doing business as the Clayson Map Company, Plaintiff, v. The Riverside Land & Irrigation Company, a Corporation, Defendant, at one time pending in the county court, state of Colorado, county of Denver. It is said in the brief of counsel for the United States that "the purpose for which said exhibit was introduced is evident, and for that purpose it is competent testimony." We regret if the purpose of the admission of this exhibit was evident to counsel that he did not think it best to inform us of that purpose, for we are involved in some doubt upon the subject. At the time the exhibit was first offered testimony was being given on the part of the United States for the purpose of showing that Wright and White ordered the maps and map literature which were circulated by the Riverside Land & Irrigation Company and which embodied the alleged false representations made by the defendants; the Clayson Map Company being the company which printed the maps and map literature. The complaint which forms a part of the exhibit alleges a cause of action for a balance of $424.20 for maps and map literature. The judgment rendered was upon default, and there is no recital in the judgment that any service of process was ever had upon the defendant, and nothing appears in the exhibit to show that the court had any jurisdiction over the defendant to render the judgment which it did. The return of the sheriff indorsed on the execution shows that $150 of the judgment was collected from the irrigation company, and a further certificate appears that a demand was made upon J. A. Wright, president of the company, for the balance of the judgment, which Wright failed to pay. The exhibit, when offered, was objected to for the reason that there was no evidence that process had been served upon any one in the action, and that the same was incompetent, irrelevant, and immaterial. This objection was sustained, but at a subsequent period of the trial the exhibit was again offered and admitted, over the same objection. If the exhibit was introduced for the purpose of showing that the Riverside Land & Irrigation Company purchased the map literature which was circulated, and contained the promises, representations, and pretenses which the indictment allege to be false, it certainly ought to have been excluded. The ex parte statements in the complaint were not competent evidence against any one (Lemon v. United States, 164 Fed. 953, 90 C. C. A. 617), and the judgment rendered by a court which was not shown to have any jurisdiction over the defendant amounted to nothing. Again, if the exhibit was offered for the purpose of showing that the Riverside Land & Irrigation Company, and hence the defendants, were insolvent, it was wholly inadmissible for that purpose, and its admission may have been very prejudicial to the defendant. In this connection it is proper to refer to a paragraph in the charge of the trial court, which reads as follows:

"And so here, Gentlemen of the Jury, the prime question for consideration and determination is whether or not the water, in fairly sufficient amount to irrigate a substantial tract of land on the mesa, could be had, and if had, whether it was possible to conduct it, within the bounds of reason, to the land and apply it for irrigation purposes, and, if so, and if it was, in your judgment, the intent and purpose of the defendants to do that, they were not guilty,

of concocting the fraudulent scheme charged in the indictment. But it appears from the testimony in this case that some of the defendants were men without any substantial means of their own to put in this venture, and I believe their counsel has said, in argument, that none of them were men of large means. The company which was organized apparently had no capital fund that it could devote to that purpose; the whole project, if it could be carried out, must rest upon the future value of the land, raising the first payment on sold water rights from those who took up the land, or would purchase water rights on land already patented, waiting thereafter for sufficient money to construct the system."

This language from the charge is not quoted for the purpose of making any criticism of the charge, but for the purpose of showing that the apparent insolvency of the company was regarded as a material factor in determining the question as to whether or not the defendants intended to defraud. The judgment in Exhibit No. 7, together with the return of the sheriff, might have been strong evidence in the minds of the jurors bearing upon the question of whether the defendants had any right to assume they could carry out any such scheme as they had entered upon. We cannot come to any other conclusion than that the admission of this exhibit was error.

[7] Error is assigned in the admission of the testimony of Mary N. Hicks, a witness on the part of the United States. The defendant Woody was not on trial. Still he was manager of the Colonization Company, which was the sales agent of the Riverside Land & Irrigation Company, and Woody had much to do with the circulation of advertising literature. The witness Hicks was asked the following question:

"What was Mr. Woody's financial condition? Can you give us that?"

The question was objected to as incompetent, irrelevant, and immaterial. The objection was overruled, and an exception taken. After counsel for the United States had directed the witness to the years 1909 and 1910, the witness answered as follows:

"I was led to believe at first that he had a great deal of money, but later on in my employment I came to the conclusion that that was not true, and that he had nothing."

Counsel for defendants then moved that this testimony be stricken from the record as incompetent and immaterial. The motion was overruled, and exception taken. We think the motion should have been granted. The answer of the witness simply stated the belief of the witness, and no facts upon which it was based. Such testimony bore directly upon the financial ability of Woody one of the defendants; and, while Woody was not on trial, he still was jointly indicted with the other defendants, and the force of the testimony fell upon the defendants who were being tried.

[8] It is next assigned as error that the court erred in excluding defendants' Exhibit M. The offer of Exhibit M was objected to by counsel for plaintiff on the ground that it was immaterial. The objection was sustained and an exception taken. The effect of this rul-

209 F.—47

ing cannot be very well understood without setting forth the exhibit in full. It appears in the record as follows:

"The Paonia Hotel,

"John McNaughton, Proprietor.

"[See diagram at close.]

"Paonia, Colo. Aug. 29, 1909.

"Dear Mr. White: I talked with Mr. Martin this morning and found that he got the line to the river last night. He struck the North Fork 100 feet vertical above the forks of the river so that it will take about 7 mi. more of line if we adopt this elevation. After leaving Somerset there will be some rock work but taken as a whole he thinks this a very satisfactory line, for two reasons: We cross high enough to avoid most of the difficulty in crossing side gulches and there will be but little cost for right of way. Back of the Big Indian the line contemplates a 6000 ft. tunnel which will cut out about 6 mi. of hard ditching. He will go to Bridgeport with me in the morning and pick up the line and extend back to Pickett Ranch. I have asked him to do this at your suggestion and I think you can calculate that the line will be to Pickett's not later than Wednesday. He will then (platt) up his notes and by Monday Sept. 5th we will be ready for Anderson.

"As I wrote yesterday I will have a camp at Dominguez Tuesday morning. Will have Herring there and will handle all business from there. Woody has four people that I will locate tomorrow, and I am arranging so that I will be free to look after the surveys, &c. in two or three days. I have arranged here for camping outfit and will take my long (d-ferred) trip as soon as I can get away. Of course in all this matter I will carry out your wishes as to the order of the work undertaken. I would like however to suggest again that in the event of my finding adequate storage high up, Anderson's report if made at this time would necessarily be premature. It would seem as if the right thing to do would be to run the line back to the Pickett Ranch, there let Martin (platt) his notes while I take a trip in the hills. Then let Anderson come and go over the line. This would bring him here about the last of Sept. as I would like to take a matter of three weeks for my trip. We have got the location of the land well in hand and I can leave it with Herring all right in a couple of days.

"I note what you say in regard to finances and I need not say to you that I appreciate the situation. It was necessary that we go any length to locate the land but now that that is practically an accomplished fact I think we must know where we are at before we go on. Not paying our bills promptly will queer us here for years to come. I would like to suggest again that as far as the *Irrigation Co.* is concerned let's stop until we get some money. I do not wish to stop any more than any one else as I realize that every minute at this time is golden, but we must pay our bills especially wages when they are due. In the meantime I am going right on with the work unless I hear from you differently. I paid up my bills last night and have 10.00 now on hand. I will need $100.00 the end of this week as I will have to pay the men Martin has employed and also a teamster for the camp and a grocery bill.

"You may still direct my mail to the Delta House. I will not be there but will have it forwarded to me. A wire care of conductor of the Montrose-Grand Jct. train will reach us all right. We will meet both trains and be ready for any one who comes. I will have Herring make an estimate of the amount of unlocated land and report to you at once for your guidance.

"Martin tells me that he can put on a number of surveying parties now if we desire but I think it very desirable to run at least one fly line below his last one and I would like to have him do this while I am away, if I do go to the mountains. He seems to think though that he has got the line he wants right now. After talking the matter over with him tomorrow if it seems best not to run an additional line I will go with him horse back over the present line from Palisade back to the river. I am going to do this so as to suggest any additional information and work which I need at once.

"I am yours very sincerely, John Gould."

This letter was written at a time when it is claimed that the defendant was engaged in executing the fraudulent scheme set out in the indictment. It was a letter written by one defendant to another, and, generally speaking, would not be admissible except in cases like the one at bar. It was written over a year before the indictment in this case was returned, and there is no evidence that at the time the letter was written the defendants were aware that any proceedings were to be taken against them seeking to punish them for using the post office establishment in the execution of a scheme to defraud. In cases involving schemes to defraud the courts very properly allow a wide latitude in the admission of evidence for the prosecution, for it is only in this way that fraud can usually be established. The defendants are called upon to meet this situation and are entitled, within reasonable limits, to show good faith and honest intent. We think this letter was a part of the res gestæ and was admissible for the purpose of throwing light upon and characterizing the transaction in which the defendants were engaged.

In Hibbard v. United States, 172 Fed. 66, 96 C. C. A. 554, 18 Ann. Cas. 1040, the correspondence between the defendant and every patient which he had secured for treatment was held admissible on his behalf, as a part of the res gestæ tending to show the real nature of the business done by him, although this correspondence embraced other cases than those shown in evidence by the government. The court in its opinion said in reference thereto as follows:

"The elementary rule in reference to hearsay testimony, cited in support thereof, is inapplicable to either of the tenders of file wrapper contents. While it is true that the applications and correspondence thus appearing are incompetent to prove that facts existed as therein stated, they were expressly produced and offered for another purpose, well recognized for their admissibility under the rules of evidence. In connection with the testimony of the witness Edmondson, the initial exhibits were admissible (as offered) by way of illustration; and the subsequent tender of the 13 cases, alleged to contain the record of the entire course of business, became admissible as original evidence of the nature of res gestæ. With a fraudulent scheme charged, these records (as described) were competent, as circumstances in the course of the business which may tend to prove its real nature as carried on. In so far as such circumstances are fairly contemporaneous with the proofs offered to establish fraudulent device and execution, the doctrine is elementary that they constitute parts of the res gestæ 'and may always be shown to the jury, along with the principal fact.' "

In Harrison v. United States (C. C. A.) 200 Fed. 662, it was said:

"The nature of the issue to be tried, as it has been developed in this opinion, will make it clear that the respondent's acts and efforts in the summer of 1910 to raise money with which to meet these refunds will directly bear on his intent to pay, or to avoid payment. Even his statements made in the course of such efforts, if natural to be made in connection therewith, and if not made in anticipation of this controversy, will be admissible as part of the res gestæ bearing on his intent. His statements in August that he wished his agent to use all available property as security to borrow money on account of its urgent need for making refunds was, so far as the court could say, very probably an 'incident immediately and unconsciously associated with the act.' If the jury regarded it as 'voluntary individual wariness,' then it would lose its evidential force. St. Clair v. United States, 154 U. S. 134 [14 Sup. Ct. 1002, 38 L. Ed. 936]."

In St. Clair v. United States, referred to in the language above quoted, the rule in regard to the admission of evidence as being a part of the res gestæ is stated as follows:

"Circumstances attending a particular transaction under investigation by a jury, if so interwoven with each other and with the principal facts that they cannot well be separated without depriving the jury of proof that is essential in order to reach a just conclusion, are admissible in evidence."

In this opinion the Supreme Court approves the following language taken from 1 Wharton on Evidence, § 259 (2d Ed.) 1879:

"Their sole distinguishing feature is that they should be the necessary incidents of the litigated act; necessary in this sense: That they are part of the immediate preparations for or emanations of such act and are not produced by the calculating policy of the actors. In other words, they must stand in immediate casual relation to the act, a relation not broken by the interposition of voluntary individual wariness, seeking to manufacture evidence for itself. Incidents that are thus immediately and unconsciously associated with an act, whether such incidents are doings or declarations, become in this way evidence of the character of the act."

We are satisfied that error was committed in the exclusion of Exhibit M.

We have examined the other errors assigned as to the admission and exclusion of evidence, and have arrived at the conclusion with reference thereto that no error appears in the rulings complained of; but, for the errors which we have herein mentioned, the judgments below must be reversed, and a new trial granted; and it is so ordered.