## KRIEBEL v. UNITED STATES.

## POMMERY v. SAME.

(Circuit Court of Appeals, Seventh Circuit. March 12, 1925.)

Nos. 3478, 3479.

**1. Post office ⬤═35—Purchase of stock and payment of premiums held no defense to prosecution for obtaining money under false stock purchase plan.**

In prosecutions for obtaining money by false pretenses, where there was an unperformed agreement to buy stocks for investors on payment of 20 per cent. of the cost, and from which stocks investors were to get the dividends from time of the payment of 20 per cent., it is no defense that a large number of investors, who made all payments, received their stocks and what amounted to dividends thereon, where stocks were not purchased until maturity of investors' contract, so that payment of dividends was in itself a fraudulent representation.

**2. Post office ⬤═35 — No defense that acts charged were acts of corporation.**

In prosecution for obtaining money under false pretenses, it is no defense that acts charged were acts of a corporation, where evidence supported allegations that defendants did acts under name of corporation.

**3. Post office ⬤═48(4)—Charge held sufficiently to allege persons to be defrauded.**

In prosecution for obtaining money under false pretenses, charge that artifice was to obtain money from persons desiring to purchase stock, and that defendants falsely represented to public and divers individuals, in this indictment hereafter named, *held* sufficient allegation as to persons to be defrauded.

**4. Post office ⬤═48(4)—Indictment held sufficiently to allege intent.**

In prosecution, under Criminal Code, § 215 (Comp. St. § 10385), providing that whoever, having devised or intending to devise a scheme to defraud, shall use mails to execute such scheme, shall be punished, an indictment charging that there was a false pretense to obtain money, that circular containing scheme was mailed, and that defendant would not and did not do the things represented, sufficiently alleges intent, though word "intent" was omitted.

**5. Conspiracy ⬤═47—Evidence held sufficient to show conspiracy, though no direct proof thereof.**

In prosecution for obtaining money under false pretenses and conspiracy, evidence *held* sufficient to sustain count of conspiracy, though direct proof of conversation between defendants, or knowledge by defendant charged as conspirator, of source of money used to buy stock, was not shown.

**6. Criminal law ⬤═925(5)—That marshal urged jury to hurry up with verdict not ground for new trial.**

In prosecution for obtaining money by false pretenses, act of deputy marshal, shortly before verdict, informing jury that they had better hurry up, as judge was leaving city, was circumstance to be considered by court with reference to its effect on rights of parties, and its decision that new trial was not required was proper.

**7. Post office ⬤═49—Oral evidence to prove scheme to obtain money by false pretenses held competent.**

In prosecution for obtaining money by false pretenses, oral evidence to prove scheme was competent, though it was necessary to show as an element of offense that mails were used to distribute scheme, since scheme did not consist simply of advertisements sent through the mail.

**8. Criminal law ⬤═1169(2)—Admission of oral evidence of scheme held not error, where same representations made in circulars sent through mails.**

In prosecution for obtaining money by false pretenses, an essential element of which was sending of scheme through mails, it was not reversible error to admit oral evidence of scheme, where same representations were made in circulars sent through mails.

**9. Conspiracy ⬤═45—Evidence that defendant sent for, and his codefendant forged, fraudulent confirmation of stock purchasers under fraudulent stock purchase scheme, held properly admitted.**

In prosecution for obtaining money by false pretenses and conspiracy, under scheme to buy stock for investors on payment of 20 per cent. of value, confirmation of stock purchases, written for by defendant on demand of auditors, which were false and forged by one of defendants, were properly admitted as to both defendants, since defendant writing for confirmations knew of falsity, and defendant forging them thereby showed willingness to aid in carrying on fraudulent transaction.

In Error to the District Court of the United States for the Eastern Division of the Northern District of Illinois.

Fred L. Kriebel and Henry Pommery were convicted of obtaining money by means of false and fraudulent pretenses, and of conspiracy for such purpose, and they bring separate writs of error. Affirmed.

Robert N. Golding and Weymouth Kirkland, both of Chicago, Ill., for plaintiff in error Kriebel.

David Stansbury, of Chicago, Ill., for plaintiff in error Pommery.

John Elliott Byrne, of Chicago, Ill., for the United States.

Before EVANS, PAGE and ANDERSON, Circuit Judges.

PAGE, Circuit Judge. Plaintiffs in error were found guilty as charged in the indictment. The first count charges that Kriebel and Pommery, under the name of Kriebel & Co., devised a scheme and artifice for obtaining money by means of false and fraudulent pretenses and representations, in that

by use of the mails they falsely represented that they were buying and holding for their customers, until fully paid for, shares of stock dealt in upon the stock exchanges. The second and third counts are the same as the first, except that each charges a different use of the mails. The fourth count charges conspiracy.

Plaintiff in error Kriebel, in No. 3478, and Pommery, in No. 3479, were tried together, but are prosecuting their writs separately. The examination of some 300 exhibits, not in the abstract, nor listed or certified to by the District Judge, has entailed a great amount of unnecessary work.

Kriebel commenced the business in question September 1, 1917, and incorporated it in February, 1918. Except that it bought from Kriebel in March, 1918, some stocks of unknown value and assumed Kriebel's debts of $41,482.73, for which Kriebel was given $60,000 in capital stock, Kriebel & Co. never had any assets not taken from purchasers. Kriebel and his wife always constituted a majority of the board of directors, and the business was always under his absolute control.

The public was told that under the so-called "Kriebel systematic savings plan" any one could select and purchase from Kriebel & Co. standard investment stocks and bonds by paying in cash 20 per cent. of the cost of the stocks selected, and that Kriebel & Co. would buy those stocks and carry them for the purchaser upon a contract by the purchaser to pay the remaining 80 per cent. (plus 10 per cent. thereof) in 20 equal monthly installments, without interest, and that the purchaser was to receive all dividends upon the stock and interest on the bonds purchased. The 10 per cent. was to be the sole compensation to Kriebel & Co. for all its services and expenses, including the carrying of the stock during the period of partial payments. When stock was ordered, Kriebel & Co. issued to the purchaser a contract, certifying to the purchase and the down payment, with coupons covering deferred payments. By every sort of seductive advertising through the mails, the people were told about the plan, and that any one owning one of those contracts immediately obtained control of securities of the value of five times the initial payment.

In an advertising booklet, "Getting Ahead," Peter Perkins represents the purchasing public, and Roberts represents Kriebel & Co. Perkins tells Roberts of his desire to become an owner of stocks, although he is a man of very small means. Roberts

says: "I will buy these stocks for you, and you can pay me 20 per cent. down and the balance in 20 equal monthly payments. I am going to make a charge of 10 per cent. for the deferred balance for the 20 months, and give you all the dividends that are declared by the various companies during that time."

Again, in "Theory and Practice of Successful Investing," another advertisement, Kriebel asks and answers the question for the careful purchaser: "But, if I should need cash, can I sell? You can sell at any time. * * * If you were in need of cash, you would naturally sell only enough of your stocks to provide the necessary amount."

Kriebel's "Principles of Profitable Investing" is a paragon of good, sound advice and caution to investors, evidently intended to impress the public with the knowledge, ability, caution, and honesty of the Kriebel concern. The public is warned against the danger of buying on margins, viz.: "Too frequently it happens that a type of securities houses unduly tempt, and in fact encourage, people to buy on margins. * * * The injustice of this sort of publicity is great. * * * It encourages hazardous speculation, pure gambling, and financial loss usually follows."

In February, 1921, in its magazine called "Investment," Kriebel & Co., as a sort of cap sheaf to all assurances that had gone before, told the public: "The Kriebel systematic saving plan has long since passed the experimental stage. With many thousands of contracts in force in all parts of the United States and in Canada, theory becomes worthless, and argument is quite beside the mark. * * * The Kriebel plan has been in operation during a period that includes boom times, hard times, peace and war, and a stock market that has for the most part been decidedly weak. None of these conditions affect its successful operation noticeably. The investors who buy on the Kriebel plan buy for keeps. They do not trade in and out of the market. They are strictly investors—not speculators—and they invest whenever they are ready, regardless of conditions. * * * The Kriebel plan is a safe form of investment, because we deal in high-grade securities; we buy them outright immediately upon receipt of your order; the payments in hand are always ample to protect you against decline; and we charge a fee for the service that is sufficient to cover operating expenses and leave us a fair margin of profit."

By every fair reading of the advertise-

ments the public was led to believe that: (a) Kriebel & Co. had worked out and thoroughly tested a plan by which the public could safely purchase stocks under the Kriebel plan; (b) that Kriebel & Co. had looked to every element of safety for the protection of purchasers, and was equipped to carry out on its part the contracts it was offering; (c) that it thoroughly understood the risks and dangers and almost certain financial loss attendant upon buying on margins, gambling, and speculating in stocks; (d) that the stocks purchased by customers were immediately purchased and carried for purchasers as their stocks; (e) that those stocks commenced at once to earn dividends that belonged to the purchaser.

What was done to carry out the plan? In a confidential letter to the clients of Kriebel & Co., Kriebel, over his own signature, said that the gross volume of business to January 1st of each of the following years was: 1918, $17,620.89; 1919, $88,977.09; 1920, $665,937.18; 1921, $2,881,042.51; and to January 1, 1922, $4,582,035.83. No stocks were bought at the time contracts were made with customers, and up to May 20, 1920, when Kriebel & Co. had sold $900,000 in stocks, "Mr. Kriebel thought it advisable to go out and buy $900,000 worth of stocks, which he bought from Winkleman & Co.," New York brokers. As many of the stocks theretofore sold were curb stocks, upon which they could not borrow money, they "put approximately the same amount of money into listed securities." Those stocks, 13,633 1/3 shares, costing $995,246.20, were bought from Winkleman on margin in June, 1920, and immediately resold for $3.60 more than their purchase price. The next purchase of stocks by Kriebel & Co. was through Keene & Co., a brokerage concern consisting of Keene and the defendant Pommery, who started business in March, 1920. Keene was really an employé of Pommery. In July, 1920, Pommery told Keene, "Well, we are going to do a little Chicago business," and then told him about the commissions to be charged. Orders were received through the mail for several odd lots; odd lots being lots of less than 100 shares, and 100-share lots or more being known as round lots. Keene and Pommery continued together until February, 1921. During that time there were $239,478.11 worth of odd-lot stocks bought and delivered to Kriebel by Keene & Co.

March 15, 1921, Pommery, with one H. P. Mills, under the name of H. P. Mills & Co., made the same sort of arrangement he had had with Keene. On the day Mills was employed by Pommery, Kriebel and Pommery were in the private office together, and thereafter Kriebel was there once a month, frequently for four or five hours at a time. The Mills and Pommery relations were discontinued September 15th of that year. Between April 1 and July 1, 1921, $1,500,000 worth of stocks were bought for Kriebel & Co. All round lots bought by Mills & Co. were resold, many of them on the same day. Odd lots were delivered to Kriebel & Co. In April, 1921, Mills & Co. bought 11,800 shares for Kriebel & Co. for $366,400, and in the same month sold the same stock for $368,900. In June there were purchased 62,913 shares for $999,217, that were resold in the same month for $1,027,204. When Mills' curiosity was aroused as to why such transactions were being made and so much in commissions paid, Pommery said, "That is the way Kriebel & Co. wanted the business done." Late in 1920, Pommery asked Hoey & Co., a brokerage concern, to take on the Chicago account of Kriebel & Co., and, after investigation, Hoey did so, executing many orders between December, 1920, and February, 1922. Until December, 1921, the orders were for round lots, and after that they were mixed up. What round-lot purchases were made by Hoey & Co. for Kriebel, and what became of them, are matters that do not appear, but Luebker testified that he did not know of any money being paid to Hoey & Co. by Kriebel & Co. for other than odd-lot transactions. In addition to the purchase and sale of several millions of dollars in stocks that had no relation whatever to the purposes advertised in the Kriebel plan, Kriebel loaned three-quarters of a million dollars of the investors' money to various concerns, and the making of those loans seems a wider departure, if possible, from the stated purpose of the Kriebel plan, than the stock gambling engaged in in New York. In using the expression "stock gambling," we are but using the definition made by Kriebel in his "Principles of Profitable Investment," viz.:

"1. Gambler. He buys stocks on margins to-day, with the idea of selling to-morrow or next week, and taking his profit on a rising market. He never actually owns the stock he margins."

The books show that Kriebel & Co. lost over $200,000 in 1920. The total earnings on the Kriebel plan to the end of 1920 had been less than $325,000. For 1921 the books show a loss of $555,392, $100,000 more than 10 per cent. on the gross volume of business

during that year. That loss was substantially equal to the gross earnings of the business, yet Kriebel, on January 11, 1922, over his own signature, told the clients of Kriebel & Co. that the preferred stock had theretofore paid dividends regularly since incorporation and the common had paid 7 per cent. for the two years then past; that "a surplus of about $200,000 has been built up." When the concern went into bankruptcy, 60 days later, there was found to be an actual shortage in assets of three-quarters of a million dollars, counting all of the assets scheduled as good at their face value.

In November and December, 1921, the Kriebel books were audited. When the auditors asked Kriebel for stocks appearing upon the books, but not found in the office, Kriebel said that they were with brokers, or bankers, in New York, as collateral to loans, and that he would write them for confirmations showing the amount of stocks which they were holding, together with the balance due them. Some time after certain documents were produced, which Kriebel said were the confirmations requested, sent in answer to his letters. The evidence shows that those confirmations were false and fraudulent, in that they represented that Hoey & Co. held stocks for Kriebel & Co., which they did not in fact hold, and also in that the signatures of Hoey & Co. thereto were forged by the defendant Pommery. Practically all of the New York buying and selling operations, other than those through Winkleman, including the creation of two brokerage concerns and the employment of Hoey & Co., were done by Pommery.

[1] 1. It is very urgently pressed upon us, in justification of the Kriebel plan, that Kriebel & Co. fully performed and retired all of its matured contracts substantially up to the time of bankruptcy. It may be conceded that a large number of purchasers did receive the stock when paid for, and also received a sum equal to the dividends from the time of the contract to the completion of the payments. But the payment of dividends must have been in and of itself a fraudulent representation, because the record shows Kriebel & Co. bought no stocks until those purchased from Winkleman in June, 1920, and those stocks were not held long enough to earn a dividend, and Kriebel & Co. never did buy stocks until the maturity of the contracts.

[2] 2. It is urged that Kriebel & Co. was a corporation, and that the acts charged were the acts of the corporation. The charge is that the defendants did the acts under the name of Kriebel & Co., and the evidence supports the allegations. The business was started before there was a corporation, and was at all times wholly under the control of Kriebel. No act done emanated, so far as Kriebel & Co. was concerned, from anybody except Kriebel.

[3] 3. It is urged that counts 1, 2, and 3 do not charge any offense. The difference between the counts in this case and the Larkin Case, 107 F. 699, 46 C. C. A. 588. decided by this court, is that there the indictment merely said that the scheme and artifice was intended to defraud *divers other persons*, whereas the indictment here charges that the artifice was to obtain money from persons *who should desire to purchase shares of stock upon the plan described*. There is the further allegation that "said defendants, under the name of Kriebel & Co., according to said scheme and artifice, were to and did falsely and fraudulently pretend and represent to the public and to the divers individuals in this indictment hereafter named through and by means of divers printed circulars, etc." That allegation is followed in each of the three counts by a specific allegation of the fraudulent use of the mails to carry circulars to a person named in each of said counts. The allegation as to the persons to be defrauded is sufficient.

[4] 4. It is further urged that there is no allegation of fraudulent intent; it being urged that, instead of the indictment saying that the defendants made representations and promises without intending to perform them, the indictment simply says, "but, notwithstanding such pretenses and representations, said defendants * * * would not, and did not" do those things. It is true that intent is a necessary element of the offense charged, but a charge is not necessarily defective simply because the word "intent" is not used. The statute (section 215 of the Criminal Code [Comp. St. § 10385]) provides:

"Whoever having devised or intending to devise any scheme or artifice to defraud or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, * * * shall, for the purpose of executing such scheme or artifice or attempting so to do, or place, or cause to be placed, any letter * * * advertisement * * * in any post office * * * to be sent or delivered by the post office establishment of the United States * * * shall be fined not more than $1,000, or imprisoned not more than five years, or both."

Here the indictment charges that defend-

ants "did devise a scheme and artifice for obtaining money, by means of false and fraudulent pretenses and representations," and then is set out the representations and promises of the Kriebel plan, concluding: "But, notwithstanding such pretenses and representations, said defendants, according to said scheme and artifice, upon securing the moneys of their customer for the purposes aforesaid, would not, and did not, at the time of such purchase and order, or at any time, make any purchases * * * or do anything whatever for them in exchange for their moneys, and would and did convert the moneys to their own use of them, the said defendants, and so defraud said customers thereof."

Then follows the allegation: "That said defendants afterwards, * * * so having devised said scheme and artifice * * * by means of the false and fraudulent pretenses and representations aforesaid, for the purpose of executing that scheme and artifice, unlawfully and feloniously did place in the post office of the United States, there to be sent and delivered by the post office establishment of the United States, a certain circular," etc.

The allegation that there was a false and fraudulent pretense and representation for the purpose of obtaining money, and the further allegation that to carry out the purpose of those false and fraudulent representations the circular was unlawfully and feloniously placed in the post office for delivery to an individual named, is a sufficient allegation of intent. There is no insufficiency in the first three counts.

[5] 5. Nor is there in our opinion any insufficiency either in the allegations or in the proofs to sustain count 4. While it is true that there is no evidence as to what was said in any conversation between Kriebel and Pommery, and while it is also true that there is no direct evidence that Pommery knew the source from which came the money used in the stock gambling carried on by them, yet it is also true that direct proofs of either of those things is not necessary. It appears from the record that Kriebel was frequently in Pommery's office, sometimes four or five hours at a time. It also appears that, when Mills raised the question as to why large quantities of stock were purchased one hour and sold the next, in all cases with a large outlay for commissions, and in most cases with no profit, Pommery said that was the way Kriebel & Co. wanted it done. Pommery carried on substantially all of the buying operations in New York, and pro-

cured Hoey & Co. as a broker for Kriebel, and finally, when Kriebel had to account to the auditors for stocks that the books showed it owned, but that were not in its office, Pommery sent on to Chicago false and fraudulent confirmations, forged by him, purporting to show that the stocks were held in New York, and by so doing made himself a party to and participant in any use that might be made of such documents. Those things show conspiracy with as great certainty as though the conversations between Kriebel and Pommery were known.

[6] 6. It is further urged that, shortly before the jury returned a verdict, the deputy marshal in charge entered the jury room and said, if they were intending to reach a verdict, they had better hurry up, because the judge was leaving the city and would not return until some 29 hours later; that shortly thereafter a verdict was returned. The matter was presented to the court upon the affidavits of three of the jurors, and one by one Quinn, an attorney, as to interviews between him and other members of the jury. The jury was polled, and on the poll supported their verdict. What was done by the deputy was, so far as the parties here are concerned, merely a circumstance to be considered by the court, as he would consider any other irregularity arising in the course of a trial, solely with reference to its effect and influence upon the rights of the parties litigant. Beyond the happening, as stated, there is nothing to show that the rights of the defendants were in any wise prejudiced. The court took the affidavits, and fully considered all of the facts and circumstances presented to him, and after an elaborate review of the authorities reached the conclusion that there was nothing to require the court to exercise a discretion and grant a new trial. We are of opinion that the court followed the rule in Mattox v. United States, 146 U. S. 140, 13 S. Ct. 50, 36 L. Ed. 917.

[7, 8] 7. The objection to the admission of oral testimony relates, as counsel say, principally to the testimony of witnesses to the effect that stock was bought and carried, and that the customer could pay up at any time and get the stock. Counsel seem to be laboring under the impression that because, as an element of the offense, it was necessary to show that the mails were used for the purpose of carrying printed or written matter, oral evidence was therefore incompetent. The scheme does not consist simply of the advertisements and written representations sent through the mails, but consists of the plan and the execution of the

plan, and whatever is done to show the manner and method of carrying out the scheme may be competent evidence. We are of opinion that that which was complained of was competent; but, if it was not, it appears, as we have above shown, that the same or substantially the same representations were made in many ways in the advertisements and circulars sent through the mails.

[9] 8. Objection is made to the admission of the confirmations, purporting to have been sent by Hoey & Co. to Kriebel & Co., referred to above. There is evidence in the record from which the jury were justified in finding: (a) That the confirmations were false; (b) that the thing which gave them force, namely, the signature of Hoey & Co., was forged by Pommery; (c) that they were the confirmations sent to Kriebel & Co., as requested by Kriebel's letter to Hoey & Co., for the purpose of showing the whereabouts of stocks shown by the books of Kriebel & Co. to have been owned by that concern. The evidence was competent as to both Kriebel and Pommery. If the confirmations were false, Kriebel knew it, and that he was inducing the auditors to make use of them for the purpose of showing the standing of his business. The question whether Pommery knew the exact purpose for which they were to be used is unimportant. To put into the hands of Kriebel a forged document, purporting to show that Kriebel & Co. had assets which they did not actually have, can only be construed as a willingness on the part of Pommery to aid Kriebel in carrying on a fraudulent transaction.

The judgments are affirmed.