## GAMMON v. UNITED STATES.

(Circuit Court of Appeals, Eighth Circuit. April 19, 1926.)

No. 7066.

1. Post office ⬅50—Instruction, in prosecution for use of mails to defraud by scheme to obtain mail orders which would not be filled, held erroneous as authorizing conviction for offense not charged (Comp. St. § 10385).

In prosecution under Comp. St. § 10385, for using mails to defraud by scheme to obtain mail orders for cattle which would not be filled, instruction authorizing conviction, though all overt acts charged occurred before date of conception of alleged scheme, if any, as shown by evidence, if defendant thereafter solicited orders in a hope of bolstering up his business, held erroneous as authorizing conviction for an offense not charged.

2. Post office ⬅48(8)—Indictment charging use of mails in execution of scheme to defraud by obtaining orders which would not be filled held insufficient to support conviction for soliciting orders, knowing business to be insolvent, with hope of being able to bolster it up.

Indictment for use of mails in execution of scheme to defraud by procuring mail orders which would not be filled held insufficient to support conviction of one continuing to solicit orders, after learning of insolvency of the business, with the hope of bolstering it up and filling with some delay both old and new orders.

In Error to the District Court of the United States for the Southern District of Iowa; Martin J. Wade, Judge.

Dallas Gammon was convicted of using mails in furtherance of scheme to defraud, and he brings error. Reversed and remanded, with directions.

C. L. Byers, of Des Moines, Iowa, for plaintiff in error.

Frank F. Wilson, Asst. U. S. Atty., of Mt. Ayr, Iowa (Ross R. Mowry, U. S. Atty., of Newton, Iowa, and Ray C. Fountain, Asst. U. S. Atty., of Des Moines, Iowa, on the brief), for the United States.

Before SANBORN, Circuit Judge, and MUNGER and JOHNSON, District Judges.

WALTER H. SANBORN, Circuit Judge. The defendant, Dallas Gammon, was indicted, tried and convicted for using the mails in violation of section 10385, U. S. Compiled Statutes, to defraud eight persons, one of whom only was named in each count of the indictment, by sending to each of them through the mails a written or printed communication in the course of executing a scheme or plan to defraud them, which he had previously devised.

The alleged scheme was by false, written or printed representations that his copartnership, Gammon & Son, had available described, valuable, Polled Hereford cattle, which they would send to buyers for specified prices, to induce them to order these cattle by mail and send the purchase prices of them to his firm and then not to ship the cattle so ordered and paid for within a reasonable time or at any time and to refuse to refund the moneys thus obtained or to satisfy in any manner those who had thus purchased cattle of him by mail. At the trial these facts were established.

Warren Gammon, the father of the defendant, Dallas Gammon, and B. O. Gammon, the latter's brother, as early as 1908 were partners under the name of Gammon & Son, or Warren Gammon & Son, in the

business of buying and selling Polled Hereford cattle. They conducted this business in this way: By inquiries through the mails and by travel they ascertained from owners what cattle of this breed they had for sale and their prices, by travel and by circulars sent through the mails they informed prospective buyers that these cattle were available to Gammon & Son, and offered to sell them and ship them to the purchasers upon receipt of the prices specified in the circulars. Upon receipt of orders for them and the purchase prices, they either purchased the cattle ordered, and shipped them as directed, or shipped those ordered from a herd they owned. They conducted this business in this way from 1908 to 1918 when B. O. Gammon retired from the firm and became secretary of the Polled Breeders' Association, and on January 1, 1919, the defendant, Dallas Gammon, became a partner of his father, Warren Gammon. From 1908, when he was 18 years of age, to 1912 he had worked taking care of and shipping the cattle for this firm. He then left their employment and returned to it in 1917. On January 1, 1919, on the retirement of his brother from the firm, he became the junior partner therein. His father, Warren Gammon, always had entire charge of the financial affairs of the firm until he became very ill in March, 1923, and he died in October, 1923. Dallas Gammon knew nothing about the financial condition of the firm prior to June, 1923, and did not learn its actual condition until August, 1923. His duties always had been and were to buy, sell and ship the cattle and do the outside work. During his membership in the firm his father and he deposited all the moneys they received from the business and their personal receipts in the firm account with the bank and paid for the cattle they bought, their expenses and operation of their business and their own living expenses out of that account.

When this case was tried in December, 1924, all orders for cattle received by them prior to January 1, 1922, had been filled. They had always conducted and were conducting their business in the same way, had sent out the same character of circulars, inquiries and advertising matter from 1920 to the close of their business in September, 1924. During the years 1918, 1919, 1920 and 1921 the firm sustained heavy losses, the prices and market values of Polled Hereford cattle slumped. The firm made a purchase of cattle from New Mexico for $10,500 that on arrival proved diseased and so poor that the purchase price paid was lost. Dallas

Gammon first learned the true financial condition of his firm in August, 1923, when he and his brother, during the severe illness of their father, checked up the books and orders and found that the unfilled orders for which the firm had received the money amounted to $17,000. The defendant testified that he was confused and excited; that his father was very ill and died on October 24, 1923; that he saw that he could not pay his debts if he ceased to conduct the business; that after much anxiety and consideration he thought and hoped that he could pay them by reducing the expenses of the operation of his business and increasing it; that he accordingly borrowed $2,000 of his brother and $1,000 of his mother and continued the business until it was stopped by his creditors in September, 1924. He and his brother both testified that they never knew or suspected the true financial condition of the firm until they checked the books and accounts in August, about two months before their father's death in October, 1923.

The charges against the defendant in seven of the eight counts of the indictment are that he devised his alleged scheme to defraud and used the mails to execute it at times prior to May 1, 1923, and after September 30, 1922, while the charge in the eighth count is of his use of the mails on February 26, 1924. But the proof under that count was that its use there alleged was in October, 1922, and May, 1923, and the court charged the jury upon this subject that there was "no evidence in this case of any plan or scheme with intent to defraud until in course of time it came to a point where the defendant knew that the firm, and that he himself, were insolvent. Now what that time was I am not going to tell you; you will have to determine that for yourselves. Up to that time there is no sufficient evidence to show that he had conceived a scheme or plan for getting money; that is, there is not sufficient for a conviction. If there was any plan formed, from the evidence, it appears that it was formed at the time he found out what the condition of the company was with reference to the money and cattle, and with reference to the ability to furnish the cattle when ordered and paid for, and all that. If I understand the testimony of the defendant, and that is a matter for you to determine wholly, it was at the time that he found the badly mixed condition and the insolvency of the company he was operating, that he began to check up and found out where he stood."

[1] Since that time was substantially proved

to have been in August, 1923, since all the overt acts charged in the indictment and proved were prior to June, 1923, and since it was indispensable to a lawful conviction that the fraudulent scheme should have been proved to have been devised prior to the alleged use of the mails to carry it into effect (Smith v. United States, 208 F. 131, 133, 125 C. C. A. 353) it is difficult to understand how the defendant could have been lawfully convicted under the evidence in this case. In this state of the case counsel for the defendant assigned as error that the court charged the jury that they might return a verdict against the defendant for an offense with which he was not charged in the indictment. The charge in the indictment was that the defendant devised the scheme to obtain from prospective purchasers the mail orders for the cattle and the purchase prices of them and not to ship the cattle ordered within a reasonable time or at any time, to refuse to refund the moneys received from the purchasers, and not to "satisfy in any manner or way those customers who had purchased cattle from him by mail." There was substantial evidence that at the time orders specified in the indictment were received he was conducting the business of the firm as it had previously been conducted, that he had borrowed and put into the business $3,000 of new money and was paying off back orders.

The court charged the jury, among other things, that: "If the defendant conceived a plan to obtain money when he knew he was in failing circumstances, and had no money, and had no means of filling an order within a reasonable time, and he planned to send out these circulars for the purpose of getting money, and did not plan to have the stock ready for shipment on these orders within a reasonable time, he would be guilty in that case, and the fact that he took the money so received and tried to bolster up his business with the hope that at some indefinite time he would become qualified to fill the orders, is no defense at all."

[2] Defendant's counsel excepted to the charge of the court to the jury here quoted, because it submitted to them the guilt or innocence of the defendant of an offense that was not charged in the indictment. Upon consideration we are unable to resist the conclusion that this exception was well grounded. The offense charged was devising and using the mails to execute a scheme to get the moneys on the mail orders with the intent never to fill them, never to refund the money, never to "satisfy in any manner or way those customers who had purchased cattle from him by mail." The offense submitted to the jury by the quotation from the charge was devising and executing by the use of the mails a scheme to get the moneys on the mail orders with the intent and hope to use them to continue a business which had been successful from 1908 to 1921 and was still in operation, into which he had put $3,000 of new money, and to fill, perhaps with some delay, the orders he was taking and those he had taken. In our opinion the indictment in this case did not give the defendant fair notice that he was charged with or was to be tried for the latter offense to sustain a verdict and judgment against him for its commission. Miller v. United States, 133 F. 337, 341, 66 C. C. A. 399; Brown v. United States, 146 F. 219, 222, 76 C. C. A. 577; Harrison v. United States, 200 F. 662, 665, 666, 119 C. C. A. 78; Durland v. United States, 161 U. S. 306, 313, 314, 16 S. Ct. 508, 40 L. Ed. 709; McDonald v. United States, 241 F. 793, 798, 154 C. C. A. 495.

The judgment below is accordingly reversed, and the case is remanded to the court below, with directions to grant a new trial.