**HASS et al. v. UNITED STATES.**
No. 10796.

Circuit Court of Appeals, Eighth Circuit.
Dec. 29, 1937.
Rehearing Denied Jan. 18, 1938.

Frederick F. Faville, of Sioux City, Iowa (R. B. Cook, of Davenport, Iowa, Kindig, Faville & Mathews, of Sioux City, Iowa, and Cook & Balluff, of Davenport, Iowa, on the brief), for appellants Albert Hass, et al.

John C. Mullen, of Falls City, Neb. (Arthur F. Mullen, of Omaha, Neb., on the brief), for appellant Clarence R. Parks.

William W. Barron, Sp. Asst. to Atty. Gen., and E. G. Dunn, U. S. Atty., of Mason City, Iowa (Welly K. Hopkins, Sp. Asst. to Atty. Gen., and John T. M. Reddan, of Washington, D. C., on the brief), for appellee.

Before GARDNER, SANBORN, and FARIS, Circuit Judges.

SANBORN, Circuit Judge.

In the first five counts of an indictment, Albert Hass, W. Pingree Curtis, Frank C. Parnell, Willard A. Knight, Sam Sparrow, and Clarence R. Parks were charged with having sent five separate notices through the United States mails in furtherance of a scheme to defraud which it is alleged

they had devised, section 215, Crim.Code, 18 U.S.C. § 338, 18 U.S.C.A. § 338; and, in a sixth count, they were charged with having conspired to commit the offenses charged in the first five counts, section 37, Crim.Code, 18 U.S.C. § 88, 18 U.S.C.A. § 88. Demurrers to the indictment were overruled. A demand for a bill of particulars was refused. The defendants then entered pleas of not guilty, and (with the exception of Sam Sparrow, who was granted a severance and who had since died) went to trial. At the close of the evidence, they made a motion for a directed verdict, which was denied. The jury returned a verdict of guilty as to each of them on all counts, and from the judgments and sentences entered upon this verdict, they have appealed.

The assignments of error challenge: (1) The validity of the indictment; (2) the refusal of the demand for a bill of particulars; (3) the sufficiency of the evidence to establish the offenses charged in the indictment; (4) the admission of certain evidence; (5) certain instructions given by the court in the charge, and the court's refusal of certain requested instructions.

### 1. The Indictment.

It is contended that the indictment: (1) Is vague and indefinite; (2) charges a scheme to defraud by certain false pretenses, but with "no conformable negation of the pretenses alleged"; (3) contains no allegations that the false pretenses were made with intent that they should be acted upon to the damage of the persons to whom they were made; (4) contains no allegation that the persons to whom it is alleged the pretenses were made believed them to be true or relied upon them; (5) charges that the scheme to defraud was consummated by the false pretenses, but contains no allegation that the persons to whom they were made parted with anything of value or were damaged in any way.

Section 215 of the Criminal Code, 18 U.S.C. § 338, 18 U.S.C.A. § 338, provides:

"Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, * * * shall, for the purpose of executing such scheme or artifice or attempting so to do, place or cause to be placed, any letter, postal card, package, writing, circular, pamphlet, or advertisement, * * * in any post office * * * to be sent or de-livered by the post office establishment of the United States, * * * or shall knowingly cause to be delivered by mail according to the direction thereon, * * * any such letter, postal card, package, writing, circular, pamphlet, or advertisement, shall be fined not more than $1,000, or imprisoned not more than five years, or both."

The offense defined by this statute consists of two essential elements: (1) The existence of a scheme to defraud; and (2) the placing or causing to be placed in the post office of a letter, postal card, or other mailable matter for the purpose of executing or attempting to execute the scheme. Fournier v. United States, 7 Cir., 58 F.2d 3, 5; Wolpa v. United States, 8 Cir., 86 F.2d 35, 40; United States v. Young, 232 U.S. 155, 34 S.Ct. 303, 58 L. Ed. 548; Robins v. United States, 8 Cir., 262 F. 126.

The purpose of this indictment was to apprise the defendants of the crimes charged against them with such reasonable certainty as to enable them to make their defenses; to prevent their being taken by surprise by the evidence of the government; and to protect them, after judgment, from another prosecution for the same offenses. Wolpa v. United States, 8 Cir., 86 F.2d 35, 40; Berger v. United States, 295 U.S. 78, 82, 55 S.Ct. 629, 630, 79 L.Ed. 1314; Claiborne v. United States, 8 Cir., 77 F.2d 682, 689; Cowl v. United States, 8 Cir., 35 F.2d 794, 797.

In such an indictment, "while particulars of the scheme are matters of substance and must be described with certainty sufficient to show its existence and character and to fairly acquaint the accused with the particular fraudulent scheme charged against them, the scheme itself need not be pleaded with all the certainty as to time, place and circumstance requisite in charging the gist of the offense, the mailing of the letter or other article in execution or attempted execution of the same." Gardner v. United States, 8 Cir., 230 F. 575, 578; McClendon v. United States, 8 Cir., 229 F. 523, 525; Cowl v. United States, 8 Cir., 35 F.2d 794, 797, 798; Colburn v. United States, 8 Cir., 223 F. 590, 593; Wolpa v. United States, 8 Cir., 86 F.2d 35, 40.

The indictment here under consideration charges that prior to December 10, 1931, there were in existence two fraternal benefit societies, the Modern Brotherhood of America (hereinafter called "Modern

430

Brotherhood") organized under the laws of Iowa, and the Independent Order of Foresters (hereinafter called "Foresters") organized under the laws of Canada; that each of these societies had a large number of members or benefit certificate holders, and that the assets of each of the societies belonged to its members; that on December 10, 1931, the two societies merged, the Foresters taking over the business, assets, and members of the Modern Brotherhood and assuming its liabilities; that the defendants had devised a "scheme and artifice to defraud" the Foresters "as it should and did exist after the said merger and consolidation and a large number of persons belonging to that class of persons who were members and benefit certificate holders of the said Modern Brotherhood of America who should be and did become, by virtue of said merger and consolidation, members of the said The Independent Order of Foresters as the said The Independent Order of Foresters should and did exist after the said merger and consolidation * * *, and to obtain money and property from the said persons to be defrauded by means of false and fraudulent pretenses and representations, statements and promises hereafter set forth"; that "it was part of said scheme and artifice" that the defendants, some of whom were directors of the Modern Brotherhood, should and they did dominate and control its activities pending the merger and consolidation with the Foresters, and that they should and they did cause the merger, and that they should and they did wrongfully obtain from the persons to be defrauded $300,000 "for the merging and consolidating, and the causing to be merged and consolidated" of the Modern Brotherhood and the Foresters, "without the knowledge or consent of the persons to be defrauded"; that it was further a part of said scheme and artifice that the defendants should and they did convert the $300,000 received from the persons to be defrauded, without the knowledge and consent of such persons; that "it was further a part of said scheme and artifice" that the defendants, while in control of the Modern Brotherhood and while some of them were acting as directors and officers thereof, should and they did, on or about November 7, 1931, at Mason City, Iowa, execute and cause to be executed a written contract to merge the Modern Brotherhood with the Foresters; that "it was further a part of said scheme and artifice" that the defendants should and they did,

on or about November 7, 1931, deliver the contract of merger to the commissioner of insurance of the state of Iowa for approval; that "it was further a part of said scheme and artifice" that the defendants should and they did cause to be held in the city of Chicago, Ill., on or about December 9, 1931, a convention of duly elected and qualified delegates of the Modern Brotherhood to vote approval of the merger agreement and to authorize the merger; that "it was further a part of said scheme and artifice that the said defendants at the said convention and meeting to be held and held at the time and place aforesaid, should and they did, by means of false and fraudulent pretenses, representations and promises then and there to be made, and made and caused to be made by the said defendants to the said delegates, then and there cause the said delegates to vote in behalf of and for the said Modern Brotherhood of America and its members, their approval of the said contract and agreement to merge and consolidate and vote their approval of and authorization for the said merger and consolidation of the said Modern Brotherhood of America with the said The Independent Order of Foresters"; and "that the said false and fraudulent pretenses, representations and promises intended to be made and made and caused to be made by the said defendants, as aforesaid, at the time and place aforesaid, were to the effect that the board of directors of the said Modern Brotherhood of America deemed it to the best interests of the said Modern Brotherhood of America and its members that the said society merge and consolidate its business with the business of the said The Independent Order of Foresters and to the effect that if the said merger and consolidation was voted upon with approval and authorized by the said delegates in behalf of and for the said Modern Brotherhood of America and its members, the then officers and directors of the said Modern Brotherhood of America would be employed and engaged by the said The Independent Order of Foresters for a period of four years, but only at an annual salary which was of the same amount that the said directors and officers were then respectively receiving as an annual salary as directors and officers respectively of the said Modern Brotherhood of America; the defendants then and there intending by said pretenses, representations and promises to have the said delegates understand and believe that the only purpose of and reason for the proposing of

the said merger and consolidation was to protect and safeguard the interests of the said Modern Brotherhood of America and its members and that none of the then officers and directors of the said Modern Brotherhood of America would receive or obtain any money by reason of said merger and consolidation other than that amount of money to be paid them by the said The Independent Order of Foresters as an annual salary which said amount of money was to be the same amount as the said officers and directors had been receiving as an annual salary respectively as officers and directors of the said Modern Brotherhood of America"; and "that said pretenses, representations and promises, as the defendants and each of them when so making and causing the same to be made to the said delegates and when committing the several offenses in this indictment hereafter charged well knew, were false and fraudulent in that the said merger and consolidation was proposed not for the purpose of protecting and safeguarding the interests of the said Modern Brotherhood of America and its members, but was proposed for the purpose of obtaining by the said defendants from the said persons to be defrauded, the said large amount of money without the knowledge and consent of said persons to be defrauded and were false and fraudulent in that the then officers and directors of the said Modern Brotherhood of America, some of whom are the said defendants, were not, as a result and because of the said merger and consolidation to receive and obtain only that amount of money which was to be paid them as an annual salary by the said The Independent Order of Foresters, but they were to and they did receive and obtain as a result and because of said merger and consolidation, a large amount of money, to-wit: $300,000 other and in addition to the amount of money which was to be paid and was paid them as an annual salary by the said The Independent Order of Foresters"; that on or about the 25th day of November, 1931, at Mason City, Iowa, the defendants "so having devised said scheme and artifice for obtaining money and property by the means aforesaid from, and to defraud the persons to be defrauded as aforesaid, for the purpose of executing that scheme and artifice and attempting so to do," placed in the post office of the United States at Mason City, Iowa, five notices each addressed to a different person, calling a special convention of the Supreme Lodge, Modern Brotherhood of America, at the Hotel Del Prado, in Chicago, for December 9, 1931, "for the purpose of considering, acting and voting upon" the proposed plan of merger.

The first five counts of the indictment, which charge the substantive offenses, are identical except that a different party is named in each count as the addressee of the notice alleged to have been mailed.

The conspiracy count of the indictment is in conventional form, and charges the defendants with having conspired to devise the scheme described in the first five counts and to execute it through the use of the mails.

Giving to the language of the indictment a sensible construction, we think that it charges a single scheme to defraud by means of the false and fraudulent pretenses specified in the indictment, a scheme whereby, by making such false representations, the defendants, all of whom with the exception of Parks were officers and directors of the Modern Brotherhood, should and did cause the Supreme Council of that society to approve and authorize the merger, and thus should and did enable the defendants to obtain wrongfully from the Foresters $300,000 for effectuating the merger.

■ This scheme is, in our opinion, sufficiently described in the indictment to apprise the defendants as to its nature and as to the representations which it is claimed were to be made and were made by them in executing it. The indictment, after stating what the representations were to be, and what they were, alleges that they were false and that the defendants knew them to be false, and then alleges why they were false. This was a sufficient negation of the truth of the representations. United States v. New South Farm & Home Company, 241 U.S. 64, 68–71, 36 S.Ct. 505, 60 L.Ed. 890.

■ But the defendants contend that there is no charge that they intended to induce the persons to whom the representations were made to act thereon, and that it is not alleged that they intended that the representations should be believed or relied upon. Having charged a scheme to defraud a group of persons by means of representations which were false and known to be false and which were made for the purpose of inducing and did actually induce the approval and consummation of a merger whereby the defendants wrongfully procured $300,000 from the persons to be de-

frauded, it was not necessary that the indictment should go further and allege that the defendants, at the time they made the representations, intended that the false representations should be believed and relied upon and should produce the result which they were obviously intended to produce. The intent of the defendants in these respects is a necessary inference from the facts stated in the indictment. Kriebel v. United States, 7 Cir., 8 F.2d 692, 695, 696; Ewing v. United States, 9 Cir., 136 F. 53, 57.

■ The contention that because the indictment charges the consummation of the scheme to defraud, it must. also show that the persons to whom the representations were made parted with something of value to them, is without merit. The crime denounced by the statute is the mailing of the notices in executing or attempting to execute the scheme. If the scheme was devised prior to the time the notices were mailed and if the notices were mailed in execution of it, the crime was then complete whether those to be defrauded were actually defrauded or not. Furthermore, it is charged in the indictment that the defendants did wrongfully obtain $300,000 from the Foresters after that society had absorbed the members of the Modern Brotherhood.

■ From what has been said, it is apparent that the indictment was not duplicitous, as the defendants claim. It charges but the one scheme and artifice to defraud and to obtain money by false and fraudulent pretenses.

In Livezey v. United States, 5 Cir., 279 F. 496, at page 498, certiorari denied 260 U.S. 721, 43 S.Ct. 12, 67 L.Ed. 481, the court considered a similar contention, and disposed of it in the following language:

"It is contended that the indictment is bad for duplicity, because it charges a scheme to defraud and also to obtain money by false and fraudulent representations. We do not think the objection is tenable. It is not pointed out in argument that there is a difference between a scheme to defraud and one to obtain money by false and fraudulent representations, and we are unable to perceive any. The indictment sufficiently charges both a scheme to defraud and the use of the mails. Ruthven v. United States, 222 F. 70, 137 C.C.A. 364; Bartell v. United States, 227 U.S. 427, 33 S. Ct. 383, 57 L.Ed. 583; United States v.

Young, 232 U.S. 155, 34 S.Ct. 303, 58 L. Ed. 548; Preeman v. United States, 244 F. 1, 156 C.C.A. 429."

See, also, United States v. Stever, 222 U.S. 167, 173, 32 S.Ct. 51, 53, 56 L.Ed. 145, in which the Supreme Court said:

"Whether the facts averred in this count constitute a scheme to obtain goods or money by a common-law false pretense may admit of grave doubt. But whether that be so or not, it would require very subtle distinction to conceive of a use of the mail to promote a scheme to obtain property or money by means of false pretenses which would not also be a 'scheme or artifice to defraud' within the plain meaning of § 5480" [the predecessor of present section 215, Crim.Code, 18 U.S.C.A. § 338].

While we do not regard the indictment as a model of criminal pleading, we think it is sufficient as to all counts.

### 2. The Demand for Bill of Particulars.

■ A demand for a bill of particulars in a criminal case invokes the exercise of a sound judicial discretion on the part of the trial court. Myers v. United States, 8 Cir., 15 F.2d 977, 985; Goldstein v. United States, 8 Cir., 63 F.2d 609, 612. The defendants concede this, but contend that in this case the court, in denying their demand for a bill of particulars, abused its discretion. They asked the court to compel the government to give them the following information: (1) The name or description of the person or persons who made the false pretenses; (2) how, that is in what manner, by oral, printed, or written statement or statements, the alleged false and fraudulent pretenses, representations, and promises, were made or caused to be made by the defendants; (3) what false and fraudulent pretenses, representations, and promises were made or caused to be made by the defendants, in lieu of the conclusion that said alleged false and fraudulent pretenses, representations, and promises were "to the effect" of certain matters and things as alleged in the indictment.

The particulars demanded by the defendants were different from those demanded in Billingsley v. United States, 8 Cir., 16 F.2d 754, which is relied upon by the defendants as supporting their contention that the refusal of their demand constituted an abuse of discretion. In that case the second count of an indictment charged that the defendants, on the 8th day of July,

1925, had in their possession one pint of whisky in the county of Nowata, state of Oklahoma, and that the place where such liquor was possessed was within the limits of the Indian country where the introduction of intoxicating liquor was prohibited by federal statutes. The defendants sought to ·have the government advise them the specific date and place when and where it charged °them with having had unlawful possession of whisky. This court held that the allegations of the indictment were not sufficiently certain to apprise the defendants fully of what they would be called upon to meet at the trial and to enable them to prepare their defense; and that therefore the denial of their demand for a bill of particulars constituted an abuse of discretion. It is, of course, plain that this court was of the opinion that the defendants were entitled to know at what specific place in the county of Nowata they were charged with having had possession of the whisky in violation of federal statutes relating to the Indian country. 25 U.S.C.A. § 244.

In the case at bar the trial court was not compelled to require the government to furnish the information demanded by the defendants unless it was "necessary for the protection of the rights of the accused." Bartell v. United States, 227 U. S. 427, 433, 33 S.Ct. 383, 384, 57 L.Ed. 583. Whether it was necessary for the protection of their rights was at least a debatable question, and the record discloses no surprise and no prejudice resulting from the denial of this information, and hence no abuse of discretion requiring a reversal. Peck v. United States, 7 Cir., 65 F.2d 59, 61; Somberg v. United States, 7 Cir., 71 F.2d 637, 639; Bedell v. United States, 8 Cir., 78 F.2d 358, 362.

3. Sufficiency of the Evidence.

We next turn to the evidence to ascertain whether it establishes the offenses charged in the indictment.

It tended to prove the following facts:

Defendant Hass was president and defendants Knight, Parnell, and Curtis were directors of the Modern Brotherhood. Defendant Parks was manager of the C. R. Parks Service Company, an insurance brokerage concern. Whether this company was a corporation or was merely a trade-name used by the defendant Parks is not disclosed. Apparently Parks and the Parks Service Company were one and the same legal entity.

For some time prior to December 31, 1930, the Modern Brotherhood of America had been actuarially insolvent due to the fact that the premium rates charged its members for their insurance were inadequate. It had not, however, failed to meet its obligations as they matured. In the fall of 1930, the Commissioner of Insurance of Iowa, Mr. Ray Yenter, notified the society that some action should be taken to better its financial condition. Defendant Hass was later notified by Mr. E. W. Clark, Mr. Yenter's successor as commissioner of insurance, that something must be done by the society to improve its condition, and that the thing to do was to effect a merger with some other similar society which was actuarially solvent. In 1930 the defendant Parks entered into an oral agreement with the Foresters whereby he or his company was to receive $750,000 for effecting a merger of the Modern Brotherhood with the Foresters. Of this sum, $300,000 was to be paid upon completion of the merger, and the balance was to be paid in monthly installments. The terms of the merger agreement between the Modern Brotherhood and the Foresters were finally settled and reduced to writing on or about November 7, 1931. By the agreement, the Foresters were to take over all of the assets of the Modern Brotherhood at 100 cents on the dollar (which was more than they were worth) and to assume all of its obligations. ·The members of the Modern Brotherhood were to become members of the Foresters. On November 23, 1931, the commissioner of insurance of Iowa, to whom the proposed agreement had been submitted for his approval or disapproval, pursuant to the laws of Iowa, wrote the Modern Brotherhood stating that he approved the plan and agreement of merger, and directed that the society submit the plan to a convention of its delegates "after giving to each delegate and officer entitled to vote at it a written or printed notice thereof at least ten days prior to the date of said convention." A formal written notice of the convention to be held in Chicago, which is the notice referred to in the indictment, was signed by the defendant Hass, was dated November 25, 1931, and was mailed on or about that date to the various delegates of the Modern Brotherhood through the United States mails by Mr. Sherin, the secretary of the society, at the direction of defendants Hass and Sparrow. At the convention held pursuant to the notice on December 9, 1931, the pro-

posed merger agreement was submitted to the delegates for their consideration and was explained to them section by section by Sam Sparrow, the general attorney of the Modern Brotherhood, and was thereafter unanimously approved by the delegates. The merger agreement contained a provision that the officers of the Modern Brotherhood should be employed by the Foresters for a period of four years after the merger, at the same annual salary which they were receiving from the Modern Brotherhood. The agreement was silent with respect to any commission to be paid to Parks or the Parks Service Company for effectuating the merger. No statement with reference to any such commission was made by any one at the convention. The agreement was also silent with respect to the payment of any compensation to any director or officer of the Modern Brotherhood for services in bringing about the merger or otherwise, except the salaries which were specified in the agreement and which have already been referred to. In addition to participating in the $300,000 to be paid to Parks under his agreement with the Foresters, the defendants who were officers and directors of the Modern Brotherhood had, as disclosed by the evidence, also arranged for "special contracts" with the Foresters, by the terms of which they and other officers of the Modern Brotherhood were to participate in the $450,000 to be paid by the Foresters to Parks in monthly installments under his commission contract. No reference to these "special contracts" was made at the convention. The evidence fails to show that any representation was made to the delegates by any one that the officers and directors of the Modern Brotherhood were to receive upon the consummation of the merger only the salaries provided for in the merger agreement. The merger received the approval of the commissioner of insurance of Iowa, of the attorney general of Iowa, and of the commissioner of insurance of Canada. In fairness to these officials, it should be said that none of them was informed of the commission to be paid Parks or the secret profits to be paid to the officers of the Modern Brotherhood. About a week after the convention approved the merger, the defendant Parks received two checks from the Foresters, one for $200,000, and one for $100,000. These checks were taken to the New York bank upon which they were drawn, and seventy-one cashier's checks, aggregating $292,000,

were issued to the defendants, the balance being paid to the defendants Parks and Curtis in cash. Of this $300,000, Parks received $55,000; Hass, $40,000; Curtis, $88,000; and Parnell, Knight, and Sparrow, $39,000 each. Certain sums were later paid to the defendants other than Hass and Parks for a few months under the "special contracts," but the commissioner of insurance of the Dominion of Canada procured the cancellation of these contracts and the return of much of the money obtained under them. He also procured the cancellation of the Parks brokerage contract.

It thus appears that, while the government succeeded in establishing the existence of an iniquitous arrangement whereby the defendants who were officers of the Modern Brotherhood were to receive a secret profit from Parks out of moneys paid to him by the Foresters, pursuant to the brokerage contract, after the completion of the merger, it failed to prove the existence of the scheme charged in the indictment. The scheme charged was one to obtain money by false representations from the Foresters. The only representation charged in the indictment which the government proved the defendants made or ever intended to make to the convention was to the effect that it was the opinion of the officers and directors of the Modern Brotherhood that a merger with the Foresters was to the best interests of the Modern Brotherhood. There was no evidence to justify any inference that that representation was false. The officers and directors of the Modern Brotherhood could honestly have reached no different conclusion. The Foresters was an actuarially solvent benefit society in far better financial condition than the Modern Brotherhood. If either society was injured by the merger, it was the Foresters. The evidence conclusively shows that what the defendants did, and what they intended to do, was to conceal from the delegates of the Modern Brotherhood the fact that Parks was receiving a large commission from the Foresters for bringing about the merger and that the other defendants were to receive from him a large secret profit. Thus, while charging a scheme to obtain, by means of certain false pretenses, a secret profit from the Foresters and its members as they should exist after merger, the government succeeded in proving a scheme whereby the defendants other than Parks were to obtain, by concealment of facts

which they were obligated to disclose, a secret profit from Parks upon completion of the merger.

Whether the breach of trust of which the defendants who were officers of the Modern Brotherhood were clearly guilty in concealing what it was their duty to disclose, thereby obtaining for themselves money from Parks which the law would not permit them to convert to their own use, would be a scheme or artifice to defraud under section 215, Criminal Code, 18 U.S.C.A. § 338, provided the mails were used in executing or attempting to execute the scheme, it is not necessary to determine, since the scheme which was proved was not, in any event, the scheme which the government alleged in the indictment.

In Brown v. United States, 8 Cir., 146 F. 219, on page 220, this court said:

"The purpose of requiring a description of the scheme to defraud in the indictment is to definitely and clearly inform the accused of the scheme charged against him so as to enable him to make his defense. Brooks v. United States (C.C.A.) 146 F. 223, decided at this term, and not yet officially reported; Stewart v. United States, 119 F. 89, 94, 55 C.C.A. 641; United States v. Hess, 124 U.S. 483, 486, 8 S.Ct. 571, 31 L. Ed. 516.

"It follows that one must be convicted, if at all, on the scheme as alleged and if the scheme as alleged is not substantially established by the proof he cannot be convicted."

See, also, Gammon v. United States, 8 Cir., 12 F.2d 226, 228, and Rude v. United States, 10 Cir., 74 F.2d 673, 677.

■ There is, we think, another rather obvious defect in the evidence. The five notices described in the indictment were mailed to delegates not later than November 27, 1931. The convention was held December 9, 1931, and the $300,000 was divided among the defendants on December 16, 1931. Unless the scheme to defraud existed prior to the dates of the mailing of the notices, the mailing of them could not constitute a misuse of the mails under section 215, Criminal Code, 18 U.S. C.A. § 338. Chew v. United States, 8 Cir., 9 F.2d 348, 352; Gammon v. United States, 8 Cir., 12 F.2d 226, 228. The evidence which tends to prove that the scheme devised by the defendants with respect to the obtaining of the $300,000 existed prior to the mailing of the notices, we regard as inadequate to establish that fact. There is evidence indicating that the defendants had knowledge of the "special contracts" before the notices were mailed, but no competent evidence that prior to that time they had planned that Parks should divide the $300,000 with them. There are only two items of evidence that we have been able to find which indicate that the scheme sought to be charged ante-dated the mailing of the notices. Mr. Sherin, the former secretary of the Modern Brotherhood, testified that some time after the merger, at a meeting where all of the defendants were present, he "asked Mr. Parks how long had the boys known that they were going to get this money (the $300,000) and he (Parks) said all the time." A Mr. Patton, a post office inspector who had interviewed Parks in 1934, testified: "Inspector Sparks asked Mr. Parks and I also asked him if these directors or former directors of the M.B.A. did not know that they were going to receive certain sums of money because of this merger agreement, but Mr. Parks denied that they did know. However, he stated they were no chumps." This evidence, when taken in connection with all the facts and circumstances, might create a strong suspicion that the defendants, prior to the dates when the notices were mailed, had planned to divide the $300,000 to be paid Parks upon the consummation of the merger, but it hardly goes further than that. The statement of Parks as to what the other defendants had known was a mere conclusion, and furthermore it is impossible to tell what period he meant to cover by the words, "all the time." His statement to the post office inspector to the effect that the defendants "were no chumps," is too weak a peg upon which to hang a conviction for a felonious use of the mails. It it not at all impossible that it was after the notices were mailed that those defendants who were officers and directors of the Modern Brotherhood conceived the idea of making Parks divide the first $300,-000 of his commission with them. The case of Marshall v. Lovell, 8 Cir., 19 F. 2d 751, 752, presents a somewhat parallel situation in a civil case. There a trustee made the wrongful exaction from a broker just as the deal was being consummated.

The defendants contend that in no event could the use of the mails, which was alleged and proven, constitute a use of the mails by them in furtherance of a scheme to defraud, since the mailing was

at the direction of the commissioner of insurance of Iowa and represented a corporate act of the Modern Brotherhood. The mere fact that the notices were sent out pursuant to the direction of the commissioner of insurance of Iowa and represented the corporate action of the Modern Brotherhood would not prevent their mailing being regarded as an improper use of the mails, had the evidence disclosed that the defendants caused the notices to be mailed in order to enable them to execute the fraudulent scheme charged in the indictment.

### 4. Admission of Evidence.

In view of what has been said, it is, of course, apparent that the judgments appealed from will have to be reversed. However, in view of the possibility of a new trial, attention should perhaps be called to certain errors in the admission of evidence, which might recur.

 Exhibit 28 was erroneously admitted in evidence. That exhibit is entitled, "Proposed payments of officers and deputies of M.B.A. and others." It consists of a list of names, including those of the defendants, with figures opposite them evidently representing the sums to be paid to the persons whose names are listed. It was received in evidence over the defendants' objection that there was no evidence as to who made it or as to its authenticity; that no foundation was laid for it; that it originated long after the merger, was not an admission by any one, and was wholly immaterial and incompetent. After it had been admitted, the defendants moved to strike this exhibit because none of the defendants were bound by it, no one admitted its correctness, and it was mere hearsay. The motion was overruled. The government endeavored to identify Exhibit 28 by the testimony of a Mr. Hanley, the former supreme vice president of the Modern Brotherhood. He testified that at a meeting in Chicago in June, 1932, which was several months after the merger, at which meeting all of the defendants except Parks were present, the defendant Curtis stated that each of the defendants had received statements similar to Exhibit 28. Mr. Hanley testified that he received Exhibit 28 through the mail from the commissioner of insurance of Canada; that he (Hanley) did not know where or by whom it was prepared, and that he heard no one present at the meeting say that that exhibit was a true

and correct statement. The exhibit bears no signature nor any means of identifying the person or persons who prepared it. The source of the information contained in it is not disclosed. The document is in no way connected with the defendants except by title and subject-matter and by the fact that at some time each of them received a copy of it. The document is purely hearsay so far as the defendants were concerned. In Hartzell v. United States, 8 Cir., 72 F.2d 569, 578, this court said:

"Ordinarily, where a writing is not shown to have been executed by the defendant, it cannot be offered in evidence against him. To be admissible in a criminal case, either to connect the defendant with the commission of the crime, or to procure a verdict against him, a writing must be established with that degree of certainty recognized as necessary to a conviction. Sprinkle v. United States (C.C.A.4) 150 F. 56."

See, also, Lane v. United States, 8 Cir., 34 F.2d 413, 416, a mail fraud case in which this court held that the admission of a financial statement not connected with the defendants nor shown to have been used by them was erroneously admitted in evidence.

 We think the trial court also erred in admitting in evidence government's Exhibits 40, 41, 42, and 43, which were: A copy of the brokerage contract between the Foresters and the Parks Service Company for the payment of $750,000 to the company for negotiating the merger; a copy of the special contract of employment between the Foresters and the defendant Parnell; a copy of a release of the brokerage contract; and a copy of a release of certain "special contracts." The evidence shows that Mr. Armstrong, who examined the books of the Foresters for the commissioner of insurance of Iowa, caused these copies of instruments found in the files of the Foresters in Toronto to be made. The introduction of the copies in evidence was objected to by the defendants on the grounds that they were not the best evidence, that the originals had not been identified, and that no foundation had been laid for the introduction of the copies, and also on the ground that the admission of such copies would be in violation of the Act of June 20, 1936, 28 U. S.C. § 695 et seq., 28 U.S.C.A. § 695 et seq., which prescribes the method for identifying and authenticating foreign docu-

ments, so that they or copies of them may be used in evidence in criminal proceedings in federal courts. The evidence discloses that the United States Attorney made a diligent effort to procure the original documents, copies of which were received in evidence, but was unable to do so, and that such documents were in Canada. That evidence justified the introduction of proper secondary evidence of any of the original documents properly identified and authenticated. It was not shown that any of the original documents, copies of which were received in evidence, were genuine or that they had actually been executed by the persons by whom they purported to be executed. The copies were therefore not admissible, under 28 U.S.C. § 695 et seq., 28 U.S.C.A. § 695 et seq., or under the rules of evidence as they existed at the time of the passage of that act. See Hartzell v. United States, 8 Cir., 72 F.2d 569, 578. The government contended upon the trial and contends here that the Act of June 20, 1936, 28 U.S.C.A. § 695 et seq., was not applicable to the trial of this case, because of a provision in the act that it should be prospective, and not retroactive, and because the indictment in this case was returned prior to the passage of the act, although the trial itself took place several months after the act was passed. The provision of the act which prevents a retroactive application did not make the act inapplicable at the time this case was tried. No one has a vested right in any existing rule of evidence. Congress and the Legislatures of the states may modify and control rules of evidence and may apply new rules to pending causes of action, provided a party is not deprived of his right to present his proof. Straw & Ellsworth Mfg. Co. v. L. D. Kilbourne Boot & Shoe Co., 80 Minn. 125, 83 N.W. 36, 39; Burke v. Lacock's Successors, 41 Minn. 250, 42 N.W. 1016, 1017, 1018; Saetre v. Chandler, 8 Cir., 57 F.2d 951, 954. It is not necessary to decide whether section 695 et seq. of 28 U.S.C., section 695 et seq. of 28 U.S.C.A., prescribes the exclusive means of proving foreign documents. They provided at least one means by which the government could have proved the documents the copies of which were improperly received in evidence.

■ The oral testimony of Mr. Armstrong relative to the contents of the records of the Foresters, which he found while examining the Foresters, was also inadmissible, being secondary evidence of unidentified and unauthenticated foreign documents.

Whether the admission of this incompetent evidence was actually prejudicial, it is obviously not necessary to determine.

The other errors which are assigned we are satisfied it is not necessary to discuss. If errors at all, they are not likely to recur upon a retrial of the case.

The judgment is reversed and the case is remanded with directions for further proceedings not inconsistent with this opinion.